1  Ian D. Berg (Bar No. 263586)
   Takeo A. Kellar (Bar No. 234470)
2  **ABRAHAM FRUCHTER,**
    **& TWERSKY, LLP**
3  12526 High Bluff Drive, Suite 300
   San Diego, California 92130
4  Tel:   (858) 792-3448
5  Fax:   (858) 792-3449
   iberg@aftlaw.com
6  tkellar@aftlaw.com

7  *Counsel for Plaintiff*

8  [Additional counsel listed on signature page]

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11  CITY OF ORLANDO POLICE PENSION     )
    FUND by its Trustees, derivatively on behalf  )
12  of GOOGLE INC.,                    )   Case No. CV13
                                       )
13              Plaintiff,             )
                                       )   **VERIFIED SHAREHOLDER**
14       v.                            )   **DERIVATIVE COMPLAINT**
                                       )
15  LAWRENCE E. PAGE, SERGEY BRIN,     )
    ERIC E. SCHMIDT, L. JOHN DOERR, JOHN )
16  L. HENNESSY, ANN MATHER, PAUL S.   )   **DEMAND FOR JURY TRIAL**
    OTELLINI, K. RAM SHRIRAM and       )
17  SHIRLEY TILGHMAN,                  )
                                       )
18              Defendants,            )
                                       )
19       and                          )
                                       )
20  GOOGLE INC., a Delaware corporation, )
                                       )
21              Nominal Defendant.     )
                                       )
22
23
24
25
26
27
28

ORIGINAL FILED

MAY – 2 2013

Richard W. Wicking
Clerk, U.S. District Court
Northern District of California
San Jose

CV13-02038

PSG

1       The City of Orlando Police Pension Fund ("Orlando Police" or the "Fund") through its

2   trustees and by its undersigned counsel, alleges upon personal knowledge as to itself and its own

3   acts, as well as upon information and belief as to all other matters based upon, *inter alia*, the

4   investigation made by and through their attorneys, which investigation included, among other

5   things, a review of documents filed with the U.S. Securities and Exchange Commission (the

6   "SEC"), communications with counsel for Google Inc. ("Google" or the "Company"), news

7   releases, media reports and publicly available sources concerning the Company, as follows:

**INTRODUCTION**

8

9       1.    Google operates the world's most popular Internet search service allowing users

10  to organize the information available on the Worldwide Web and make it more accessible and

11  useful.  Consumers are not charged for use of Google's Internet search engine.  Instead, Google

12  earns revenues primarily through paid advertising by merchants seeking to sell products to

13  consumers who are searching for similar items on the Internet.

14      2.    Google, like any other person or corporation, is required to comply with the law

15  in operating its business.  Among the laws to which Google's business operations are subject to

16  is the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §331(a) and (d), which prohibits the

17  introduction into interstate commerce of misbranded or unapproved drugs; as well as the

18  Controlled Substances Act, 21 U.S.C. §952 (collectively the "Drug Marketing Statutes"), which

19  prohibits the importation of controlled substances into the United States.

20      3.    Defendants, despite knowing of, or recklessly disregarding, the legal obligations

21  imposed by the Drug Marketing Statutes, allowed Google to facilitate the placing of

22  advertisements by online Canadian pharmaceutical companies soliciting the sale of products in

23  the United States.  This conduct violated the Drug Marketing Statutes.

24      4.    On August 24, 2011, the Department of Justice ("DOJ") announced that Google

25  had entered into a non-prosecution agreement with the DOJ in which Google agreed to forfeit

26  $500 million for improperly facilitating the placement of advertisements from Canadian online

27  pharmacies.  This forfeiture of $500 million represents one of the largest ever in the United

28  States.

5.      Plaintiff made a demand on Google's board of directors (the "Board") to, among other things, investigate and bring an action against those senior executives responsible for Google violating the Drug Marketing Statutes which caused, in turn, Google's forfeiture of $500 million to the U.S. Government.

6.      The Board constituted a committee (the "Committee") which produced a 149-page report (the "Committee Report") which it refused to make public but, nonetheless, served as the basis for a six page letter (the "Demand Refusal Letter") refusing to act on the demands made on the Board.  As alleged below in greater detail, the Board has improperly refused and continues to refuse demand and, therefore, Plaintiff is filing this action in order to seek redress on behalf of the Company.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, as a result of the parties having complete diversity and the amount in controversy exceeding $75,000, exclusive of interest and costs.  Plaintiff, through its trustees, is a citizen of Florida.  Nominal Defendant Google is a citizen of Delaware where it is incorporated and California where its principal place of business is located.  The Defendants are all citizens of states other than Florida.

8.      This Court also has jurisdiction pursuant to Article III of the United States Constitution ("Article III") and 28 U.S.C. §1331 as the underlying wrongdoing results from violations of the Federal Food, Drug and Cosmetic Act , 21 U.S.C. §331(a) and (d) (2013), and the Controlled Substances Act, 21 U.S.C. §952 (2013).

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391.  Nominal Defendant Google maintains its principal place of business in this District.  At least one of the Individual Defendants resides or maintains an office in this District.  Moreover, a substantial part of the acts and conduct complained of herein have occurred in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRADISTRICT ASSIGNMENT**

10.     A substantial part of the events or omissions which give rise to the claims in this action occurred in Mountain View, a city in the County of Santa Clara, and as such this action is properly assigned to the San Jose Division of this Court.

**PARTIES**

**Plaintiff**

11.     Orlando Police is a public pension fund which has been a shareholder of Google continuously since May 2, 2005.  Orlando Police is managed by a board of trustees consisting of Jay L. Smith, Vince B. Montgomery, William Long, Antonio A. Blanca and Laurie J. Botts. Orlando Police's trustees are all citizens of Florida.

**Nominal Defendant**

12.     Nominal Defendant Google is a Delaware corporation with its principal executive offices located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google is a citizen of California and Delaware.

**Individual Defendants**

13.     Defendant Lawrence E. Page ("Larry Page" or "Page"), a co-founder of Google, has been a director since the Company's inception in September 1998 and its Chief Executive Officer ("CEO") since April 4, 2011.  Page previously served as Google's President of Products from 2001 to April 3, 2011, CEO from 1998 to 2001 and Chief Financial Officer ("CFO") from 1998 to 2002.  The Company's 2012 Proxy Statement filed with the SEC on May 9, 2012 ("2012 Proxy ") admits that Page lacks independence in carrying out his responsibilities as a director. Defendant Page was a member of the Company's Executive Management Group ("EMG") at all times relevant hereto.   Page, according to the 2012 Proxy, owns 80,000 shares of Class A common stock and 26,138,596 shares of Class B common stock controlling approximately 28.4% of the Company's total voting power.  Page is a citizen of California.

14.     Defendant Sergey Brin ("Brin"), also a co-founder of Google, has been a director since the Company's inception in September 1998.  Brin previously served as Google's President of Technology from 2001 to April 3, 2011 and as its President and Chairman from 1998 to 2001.

- 3 -

The Company's 2012 Proxy admits that Brin lacks independence in carrying out his responsibilities as a director.  Defendant Brin was a member of the Company's EMG at all times relevant hereto.  Brin, according to the 2012 Proxy, owns 25,722,844 shares of Class B common stock controlling approximately 28% of the Company's total voting power.  Brin is a citizen of California.

15.   Defendant Eric E. Schmidt ("Schmidt") has been a director of Google since 2001 and the Executive Chairman of its Board since April 4, 2011.  Schmidt previously served as Google's CEO from 2001 to 2011 and the Chairman of its Board from 2001 to 2004 and 2007 to April 2011.  The Company's 2012 Proxy admits that Schmidt lacks independence in carrying out his responsibilities as a director.  Defendant Schmidt was a member of the Company's EMG at all times relevant hereto.  Schmidt, according to the 2012 Proxy, owns 132,110 shares of Class A common stock and 8,729,303 shares of Class B common stock controlling approximately 9.5% of the Company's total voting power.   Together, defendants Page, Brin and Schmidt control approximately 65.9% of the Company's voting power which combined with their positions as directors and senior executives gives them complete control over the Company and its affairs.  Schmidt is a citizen of California.

16.   Defendants Page, Brin and Schmidt are, at times, referred to herein as the "Senior Executive Defendants."

17.   Defendants L. John Doerr ("Doerr") has been a director of Google since 1999.  Doerr has been a General Partner of the venture capital firm Kleiner Perkins Caufield & Byers ("Kleiner Perkins") since 1980.  Although Doerr served on Google's Board during the time which the U.S. government was closely scrutinizing the illegal sale of drugs over the Internet and the companies which facilitated that trade, Doerr, in breach of his fiduciary duties to Google, failed to implement a system of internal controls designed to address the issues being confronted by the Company as a provider of advertising to foreign pharmacies.   Doerr is a citizen of California.

18.   Defendant John L. Hennessy ("Hennessy") has been a director of Google since April 2004 (which was a few months before the Company's initial public offering on August 19,

2004) and has served as the Board's "Lead Independent Director" since April 2007.  Hennessy has served as the President of Stanford University since September 2000 and is a citizen of California.

19.     Defendant Ann Mather ("Mather") has been a director of Google since November 2005.  Mather was a member of the Committee constituted in order to consider the Demand and those of certain other Google shareholders made on the Company's Board.  Mather is a citizen of California.

20.     Defendant Paul S. Otellini ("Otellini") has been a director of Google since April 2004.  Otellini has also served as a senior executive for Intel Corporation and is a citizen of California.

21.     Defendant K. Ram Shriram ("Shriram") has been a director of Google since 1998.  Shriram is a member of the board of trustees of Stanford University and is a citizen of California.

22.     Defendant Shirley M. Tilghman ("Tilghman") has been a director of Google since October 2005.  Tilghman has served as the President of Princeton University since 2001 and is a citizen of New Jersey.

23.     Defendants Page, Brin, Schmidt, Doerr, Hennessy, Mather, Otellini, Shriram and Tilghman are, at times, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**The Company**

24.     Google is a global technology company whose name in colloquial language has become synonymous with a verb for performing an Internet search.  Despite the pervasive nature of Google's web search technologies and its various other businesses, such as its Motorola cellular telephone business, the Company's primary business is, in fact, advertising, which generates the vast majority of Google's revenue (92% of revenue in fiscal year 2012).

25.     Google's primary advertising platform is the AdWords product which is an auction based advertising program allowing advertisers to place text-based and display ads on the Company's and its network members' websites.  Display advertising is comprised of videos,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

text, images, and other interactive advertisements that run across the web on computers and mobile devices, including smart phones and handheld computers such as netbooks and tablets. Most of Google's customers pay on a cost-per-click basis, which means that an advertiser only pays Google when a user clicks on an advertisement. The Company also offers advertising on a cost-per-impression basis that enables advertisers to pay Google based on the number of times their advertisements display on the Company's and its network members' websites as specified by the advertisers.

26.     AdWords is used by all different types of advertisers as dictated by Google and the policies it adopts in order to regulate the use of the platform. AdWords permits advertisers to select the geographic regions (*i.e.*, geo-target) where they wish their advertisements to be displayed. For many years, Google's policies knowingly permitted Canadian online pharmacies to geo-target consumers in the U.S. promoting the sale of prescription drugs to be shipped into the U.S. The shipping of drugs from foreign countries into the U.S., however, was directly contrary to federal law.

**U.S. Law Prohibits the Importation of**
**Drugs from Foreign Online Pharmacies**

27.     Pursuant to the Federal Food, Drug and Cosmetic Act of 1938 (the "Act"), 21 U.S.C. §331(a) and (d), it is illegal for pharmacies located outside of the U.S. to ship prescription drugs into the U.S. The Act seeks to protect U.S. consumers from drugs that have not been approved for sale by the U.S. Food and Drug Administration ("FDA") and that were manufactured outside of the FDA's jurisdiction, which generally requires manufactures to adhere to Current Good Manufacturing Practices ("cGMP"). Moreover, the FDA seeks to protect consumers from the practices employed by rogue pharmacies whereby prescription drugs are shipped solely on the basis of on an online consultation. Defendants were well aware that the Canadian online pharmacies, which the Company specifically permitted to target advertising to U.S. consumers, were shipping drugs into the U.S. in violation of federal law.

28.     The Controlled Substances Act, 21 U.S.C. §801 *et seq.*, which was enacted in 1970, similarly seeks to protect U.S. consumers by regulating the manufacturing, importation

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   and possession of certain controlled substances.  Thus, the Controlled Substances Act prohibits

2   the importation of controlled substances into the U.S.  The Senior Executive Defendants also

3   knew that the Canadian online pharmacies importation of controlled substances into the U.S. was

4   in violation of federal law.

5   **Defendants Knew That the Shipment of Drugs into the U.S.**
    **by Canadian Online Pharmacies Violated Federal Law**

6

7           29.     In 1999, the National Association of Boards of Pharmacy (the "NABP"), an

8   independent professional organization that seeks to support the states respective boards of

9   pharmacy in protecting public health, established the Verified Internet Pharmacy Practices Sites

10  ("VIPPS") program for accrediting online pharmacies in compliance with state and federal laws

11  and regulations and also NABP's criteria.  The VIPPS accreditation process is a rigorous one

12  designed to weed out rogue online pharmacies which care for nothing more than their own

13  profits as opposed to patient safety.

14          30.     On March 13, 2003, the NABP wrote to Google in response to the Company's

15  inquiry concerning the ability of rogue online pharmacies to advertise their services on Internet

16  search engines.  The letter to Mary Anne Belliveau, Google's Vertical Market Manager,

17  Healthcare, stated that "the importation of prescription drugs from foreign countries generally

18  violates . . . the Federal Food, Drug and Cosmetic Act."  Thus, the NABP urged Google to adopt

19  the VIPPS accreditation program in order to protect U.S. consumers from the nefarious practices

20  used by the rogue online pharmacies which posed a significant danger to the well-being of U.S.

21  consumers.

22          31.     The NABP also warned Google that it was "deeply concerned that these rogue

23  Internet sites could be a front for criminals seeking to introduce adultered medications,

24  counterfeit drugs, or worse, to the American market."  As reported by *The Wall Street Journal* on

25  May 21, 2011 in an article entitled "Google Was Warned of Rogue Drug Ads," the Company did

26  not respond to the NABP's letter.  Nor did Google take any action at the time to stop Canadian

27  online pharmacies from targeting advertisements to consumers in the U.S.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.     An October 31, 2003, article in *The Wall Street Journal* entitled "Drugstore.com Battles Portals With Imported-Drug Ads" reported that Peter J. Pitts, the FDA's associate commissioner for external relations, stated that the FDA would be "reaching out to the search engines" about "how we can work together to stem the tide of these dangerous drug dealers." The FDA added that it is almost always illegal for companies to ship drugs from other countries into the U.S.  Interviewed for the article, defendant Page was quoted as stating: "It might be easier for us to say we're not going to accept any pharmacy-related advertising, but that would mean consumers couldn't easily buy things and save money.  As a matter of principle, we want to have free choice for consumers . . . ***even if we get some hassles for it.***" (Emphasis added).

33.     Unlike Google, the company AOL, another large Internet service provider and a competitor to Google, was taking proactive measures to combat drug advertising from questionable online pharmacies.  In fact, AOL had reportedly asked Google to stop delivering any sponsored links to AOL's search engine from pharmacies that were not certified by state regulators.

34.     In November 2003, Overture, a unit of Yahoo! Inc. which provides advertising services similar to those of Google's AdWords, stopped allowing online pharmacies to buy advertising that appeared when Internet users searched for narcotics and other medications.  Overture stated its intention to begin using a third-party to verify whether to sell advertising to legitimate online pharmacies.

35.     On December 1, 2003, Google announced that it would stop running ads for foreign pharmacies that were selling prescription medications in violation of U.S. drug laws.  The move came shortly after certain other large Internet search companies including Yahoo! and Microsoft Corp. announced that they had begun cracking down on advertising by online sellers of Vicodin, Oxycontin and other controlled substances in response to pressure from the FDA and other groups aimed at deterring web sites from accepting advertising from unlicensed Internet pharmacies.  Google announced that it would begin using a third-party to verify that foreign online pharmacies using Google advertising were complying with the U.S. drug laws.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

36.     Google retained Square Trade Inc. ("Square Trade") between 2004 and 2006, and then PharmacyChecker.com LLC ("PharmacyChecker") in 2006, to verify online pharmacies. However, Google knowingly permitted Square Trade to verify Canadian online pharmacies that merely self-certified that they were in compliance with applicable U.S. regulations, without any independent corroboration; and, also knowingly permitted PharmacyChecker to certify Canadian online pharmacies that sold prescription drugs.  Thus, Google knowingly permitted Canadian online advertisers to use the Company's AdWords system to target advertisements into the U.S.

37.     Also on December 1, 2003, *The Washington Post* published an article entitled "Google to Limit Some Drug Ads; Web Giants Asked to Help Discourage Illicit Online Pharmacies."  The article explored Google's decision to work with a third-party (*i.e.*, Square Trade) to help the Company weed out rogue pharmacies and also discussed the government's efforts to dissuade the search engines from doing business with illicit pharmacies and cited three separate congressional committees looking into the issue.  Mr. Pitts from the FDA was quoted as stating "We're literally placing calls to search engines trying to get a meeting going."  In addition, the article disclosed that Google was contacted by the father of a boy who ended up in a juvenile psychiatric ward as a result of obtaining Vicodin through the use of Google's search engine.  A spokesperson for the Company stated that Google "takes this very seriously."

38.     On July 22, 2004, Sheryl Sandberg, then Google's Vice President of Global Online Sales and Operations, testified before Congress concerning Google's online pharmacy policies.  In a written submission, Sandberg described Square Trade's verification process requiring online pharmacies to be licensed.  Sandberg omitted from her testimony, however, that Google permitted Square Trade to verify Canadian online pharmacies, thus allowing them to use AdWords in the U.S.

39.     On December 13, 2004, Andrew McLaughlin, Google's senior policy counsel, testified before Congress in a hearing entitled "Safety of Imported Pharmaceuticals: Strengthening Efforts to Combat the Sales of Controlled Substances Over the Internet."  During that hearing McLaughlin admitted that Google was aware of the illegal nature of selling controlled substances over the Internet stating that:

- 9 -

1

2   We get what a serious problem this is. Google is an Internet
    company. We see what is going on. ***It is evident to us as much as***
3   ***anybody that there is a serious problem with illegal sales of on-***
    ***line drugs over the Internet.*** [Emphasis added.]
4

5          40.    On July 7, 2008, Joseph A. Caliano, Jr. of The National Center on Addiction and

6   Substance Abuse at Columbia University ("CASA") wrote to defendant Schmidt urging Google

7   to stop promoting rogue online pharmacies that were shipping controlled substances into the U.S.

8   in violation of the law.  The letter provided:

9          Enclosed is a copy of a report to be released July 9th by The
           National Center on Addiction and Substance Abuse (CASA) at
10         Columbia University, "*You've Got Drugs!*" *V*: Prescription Drug
           Pushers on the Internet, and the accompanying press release. This
11         report documents Web sites advertising and selling controlled
           prescription drugs like OxyContin and Percocet, Valium and
12         Xanax, and Ritalin and Adderall without legitimate prescriptions.
           This year, CASA found that 85 percent of Web sites selling these
13         drugs do not require a legitimate prescription, and there are no
           controls blocking the sale of these drugs.
14
           Prescription drug abuse is a major health problem in the U.S. In
15         2006, 15.8 million people reported abusing controlled prescription
           drugs, more than the combined number who report abusing
16         cocaine, hallucinogens, inhalants and heroin. Children are
           especially at risk; in 2006, 2.2 million teens between the ages of 12
17         and 17 admitted abusing a prescription drug in the past year.

18         ***Although   Google   reports   using   a   company   called***
           ***PharmacyChecker to screen out rogue pharmacies, CASA was***
19         ***able to find prominent displays of ads for rogue Internet***
           ***pharmacies in a Google search for controlled drugs included in***
20         ***our analysis. This suggests that Google is profiting from***
           ***advertisements for illegal sales of controlled prescription drugs***
21         ***online.***

22         I am writing to ask you to take effective action in three areas:

23         1.     Block all advertisements for controlled prescription drugs
           that do not come from licensed and certified online pharmacies;
24
           2.     Screen  such sites from Internet searches; and
25
           3.     Provide warnings that sale and purchase of controlled drugs
26         over the Internet from unlicensed pharmacies and physicians and
           without valid prescriptions are illegal. [Emphasis added.]
27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

41.     On December 23, 2008, the NABP wrote to defendant Schmidt in order to express their concern that Google "sponsored search results (online advertising) for Internet drug outlets that appear to be operating in violation of the law and/or accepted standards of pharmacy practice in the United States."   The letter provided, in relevant part, that:

> We understand Google's stated online policy is to allow sponsored results for internet drug outlets dispensing drugs from outside the United States, including pharmacies that are licensed in Canada. To the best of our knowledge, we understand that *a third-party verification service Google uses to screen prescriptions drug Web sites has certified several pharmacy Web sites that source their prescription drugs from various locations outside of the United States (Canada and elsewhere), which is contrary to US law and puts patient safety at risk, as FDA has stated that it cannot ensure the safety of such prescription drugs.*

> To explain our concern in more detail, pharmacies licensed in Canada are required to afford Canadian residents drug safety protection that US pharmacies afford US residents. When Canadian pharmacies dispense drugs to US residents over the Internet, however, they are not required to follow the same rules and regulations – a loophole in Canadian law that is due to the fact that the product's final destination is outside of Canada. To skirt Canadian regulations further, the prescription drugs are often shipped from third-world countries such as Turkey or India, a practice that would not be considered lawful or safe were the final customer within Canada, or if a US pharmacy were dispensing prescription drugs to a US resident.

> On one review by the FDA, 85% of imported drugs intercepted from India, Israel, Costa Rice [sic] and Vanuatu were shipped to fill orders that consumers believed were placed with "Canadian" pharmacies. Some tested as counterfeit. We are concerned that *your sponsorship of these search results, and your third-party verification service's certification of these Web sites, aids in a business practice that is contrary to US law, unsafe, and deceptive to US patients.* [Emphasis added.]

**Defendants Knew That Google Was Facilitating Canadian**
**Online Pharmacies in Targeting U.S. Consumers With Advertising**

42.     Defendants were well aware that between 2003 and 2009 Google was allowing Canadian online pharmacies to target advertising to U.S. consumers, thereby facilitating the importation of controlled substances into the U.S. in violation of federal law.  During a Congressional hearing held on September 21, 2011, defendant Schmidt admitted that he knew Google was facilitating such unlawful conduct.  Specifically, Senator John Cornyn questioned Defendant Schmidt concerning Google's conduct, asking: "Well, was it the result of oversight or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

inadvertence, or were there some employees in the company that were doing this without your

knowledge . . ." Schmidt answered: "[w]ell, ***certainly not without my knowledge***." (Emphasis

added).

43.    In an effort to provide Defendant Schmidt an opportunity to clarify his admission

of contemporaneous knowledge concerning Google's policy allowing Canadian online

pharmacies to target advertisements to U.S. consumers, Senator Cornyn corresponded with

Schmidt after the hearing. In response, defendant Schmidt again admitted his knowledge and

also that of Google's management stating:

> ***Sometime around 2004, it was brought to management's
> attention generally*** . . . I believe I first learned of the issue around
> that time through meetings and internal discussions. The
> company's policy did not block licensed Canadian pharmacies . . .
> to advertise in the United States.

*   *   *

> As I noted earlier, not blocking Canadian licensed pharmacies
> certified by Square Trade and PharmacyChecker from advertising
> in the United States was the result of a continuing discussion
> involving a variety of policy and implementation questions over
> several years, and involved many employees in the company
> beyond the policy team. [Emphasis added.]

44.    The Company's management, which included defendants Page and Brin,

Google's co-founders and respectively Presidents of Products and Technology during the

relevant periods, were also well aware that Google permitted Canadian online pharmacies to

advertise in the U.S. Indeed, Page tauntingly admitted as much in an interview for the October

31, 2003 *Wall Street Journal* article in which he stated that Google would not seek to limit

consumer choice in purchasing drugs "***even if we get some hassles for it.***" (Emphasis added).

45.    In addition, defendants Page, Brin and Schmidt were aware of Google's policy

allowing Canadian online pharmacies to target advertising to U.S. consumers because they were

members of the Company's EMG [Executive Management Group] at all relevant times hereto.

Indeed, the Company's Demand Refusal Letter admits that the issues surrounding Google's

online pharmacy advertising policies were, in fact, elevated to the EMG and that the issues were

debated among the Company's senior executives. Moreover, the letter confirms that most

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

decisions concerning the Company's online pharmacy policy were made at the senior executive level.

46. Knowledge of Google's misdeeds by the Company's senior management was also confirmed by Peter Neronha, Esq., U.S. Attorney for the District of Rhode Island (the "U.S. Attorney"), in an article published in *The Wall Street Journal* on August 27, 2011 entitled "New Heat for Google CEO --- U.S. Says Google's Larry Page Knew About Improper Online Pharmacy Ads" which provides, in relevant part, that:

> Behind Google Inc.'s decision this week to settle a U.S. criminal probe into ads it carried for unlicensed online pharmacies lies a previously undisclosed factor: ***Justice Department investigators believed company co-founder Larry Page knew of, and allowed, the ads for years.***
>
> ***Sorting through more than four million documents, prosecutors found internal emails and documents that, they say, show Mr. Page was aware of the allegedly illicit ad sales.*** Under this week's $500 million settlement, those emails won't be released, avoiding the possibility of disclosure at trial.
>
> ***"Larry Page knew what was going on," Peter Neronha, the Rhode Island U.S. Attorney who led the probe, said in an interview. "We know it from the investigation. We simply know it from the documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."***
>
> *   *   *
>
> Mr. Neronha didn't say when the Justice Department believes Mr. Page learned of the matter, though people familiar with the investigation allege it was several years ago. He declined to discuss the content of the emails, citing grand jury secrecy.
>
> Google declined to discuss whether, or to what extent, Mr. Page or other top executives knew of, or sanctioned, the ad sales. "This issue is not related to current advertising practices," a company spokesman said. "We have settled and we are moving on."
>
> Mr. Neronha said he didn't have any plans to prosecute Mr. Page or individual executives, although he said they weren't off limits.
>
> *   *   *
>
> ***"Suffice it to say that this is not two or three rogue employees at the customer service level doing this on their own,"*** Mr. Neronha said in an interview. ***"This was a corporate decision to engage in this conduct."*** [Emphasis added.]

- 13 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.     The U.S. Attorney's investigation and subsequent Non-Prosecuting Agreement ("NPA") entered into with Google on August 19, 2011 revealed that many of Google's employees were also aware as early as 2003 that Canadian online pharmacies were permitted to advertise prescription drugs to the Company's users in the U.S. through Google's AdWords platform.  For example, on November 18, 2003, a Company employee sent an email discussing the advertising budgets of several Canadian online pharmacies and noting that "[a]ll ship for Canada into the US via Express Mail."  An August 23, 2005 email from an employee in Google's policy group also stated that: "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

48.     Not only did Google know that Canadian pharmacies were using AdWords to target U.S. consumers, Google, in fact, sought to assist those pharmacies in optimizing their campaigns with the Square Trade verification procedures in mind.  Thus, on or about April 23, 2004, a Google employee based in Canada reported in an email with respect to a large Canadian pharmacy advertiser that "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind."  On or about June 4, 2004, the same employee emailed a member of the Company's policy group stating "the Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

49.     Where the online pharmacies did not meet Square Trade's or PharmacyChecker's criteria and, theoretically, could not target advertisements to the U.S., they simply avoided them by setting their ads to run outside of the U.S. where verification was not required.  Those online pharmacies would subsequently change their geo-targeting to the U.S. market, effectively skirting verification altogether.  Although Google was on notice of these tactics, the Company did nothing to stop them until it became aware of the DOJ's investigation in 2009.

50.     In addition, by 2004 Google was on notice that online pharmacies were circumventing the Square Trade and PharmacyChecker certification process by intentionally avoiding the use of certain terms in the text of their AdWords placements, and were instead

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

using those terms as advertising "keywords."  The use of keywords, which are bid on by advertisers in order to display their advertisements in response to queries by Google users, allowed certain online pharmacies to avoid a manual review by Google, which only selected an advertisement for review based on its text and not the associated keywords.  Indeed, a February 13, 2008 email from a member of Google's policy group confirmed that "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady fraudulent advertisers know not to do this."  Google only flagged keywords for review after the Company became aware of the DOJ's investigation.

51.     Google did nothing to block Canadian online pharmacies from targeting advertisements to U.S. consumers until it became aware of the DOJ's investigation in 2009. Even then Google failed to take any action for many months.  Finally, on February 9, 2010, Google announced belated changes to the Company's Pharmacy Policy in the U.S and Canada which went into effect on February 23, 2010, stating as follows:

> **Only VIPPS and CIPA certified pharmacies will be allowed to advertise**
> We've made the decision to further restrict the ads we accept for online pharmacy sites in the U.S. and Canada. Starting at the end of this month, Google AdWords will only accept ads from online pharmacies in the U.S. that are accredited by the National Association Boards of Pharmacy VIPPS program, and from online pharmacies in Canada that are accredited by the Canadian International Pharmacy Association (CIPA.)
>
> **Pharmacies can only target ads within their country**
> These pharmacies may only target ads to users in the country in which they are accredited. This policy change does not affect our online pharmacy policy for countries outside the U.S. and Canada.
>
> Accordingly, we'll no longer be using any 3rd party verifier of online pharmacies other than VIPPS and CIPA. AdWords advertisers who aren't accredited by VIPPS or CIPA will no longer see their online pharmacy ads displayed once this policy change comes into effect[.]

52.     On September 21, 2010, many months after the Company became aware of the government's investigation, Google filed a lawsuit in the Northern District of California seeking to block certain rogue pharmacies from advertising on its search engine and websites.

- 15 -

**The Government Takes Action and Google Forfeits $500 Million**

53.     On May 13, 2010 *The Wall Street Journal* published an article entitled "Google Near Deal In Drug Ad Crackdown" discussing that Google was nearing a settlement of the DOJ's criminal investigation into allegations that the Company catered to online pharmacies in violation of federal law and provided, in relevant part, that:

> The Internet company disclosed in a cryptic regulatory filing earlier this week that it was setting aside $500 million to potentially resolve a case with the Justice Department.
>
> A payment of that size would be among the highest penalties paid by companies in disputes with the U.S. government.
>
> Google gave few details in its filing about the probe, saying only that it involved "the use of Google advertising by certain advertisers."
>
> The federal investigation has examined whether Google knowingly accepted ads from online pharmacies, based in Canada and elsewhere, that violated U.S. laws, according to the people familiar with the matter.
>
>                    *    *    *
>
> One question under investigation is the extent to which Google knowingly turned a blind eye to the alleged illicit activities of some of its advertisers -- and how much executives knew, the people familiar with the matter said.

54.     On August 19, 2011, Google entered into the NPA with the DOJ admitting to the Company's wrongdoing and stating that:

> The Company was on notice that most Canadian online pharmacy advertisers, advertising through the Company's AdWords program, geo-targeted their advertisements to consumers in the United States and imported into the United States both controlled prescription drugs, in violation of Title 21, United States Code, Section 952, and misbranded and unapproved prescription drugs, in violation of Title 21, United States Code, Section 331(a) and (d).  ***The Company acknowledges that it improperly assisted Canadian online pharmacy advertisers to run these advertisements that geo-targeted the United States through AdWords***, and the Company accepts responsibility for the Company's conduct . . . .  [Emphasis added.]

55.     The NPA provided that Google would be required to forfeit $500 million to the U.S. government "as a substitute res for the proceeds of controlled prescription drug sales by Canadian online pharmacy that advertised through the Company's AdWords program."

- 16 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     In connection with its remediation efforts in the wake of the government's investigation, Google: (a) began requiring VIPPS certification for pharmacy advertisers using AdWords in February 2010; (b) retained an independent company (LegitScript) to supplement its electronic screening of AdWords in order to block non VIPPS approved pharmacies; and (c) forbid Canadian pharmacies from targeting advertisements into the U.S.  As part of the NPA, the Company has also agreed to maintain these remedial efforts, to refer pharmacies for prosecution and to report quarterly to the FDA for a period of two years following entry into the NPA.

57.     On August 24, 2011, the U.S. Attorney issued a press release announcing the NPA and Google's forfeiture of $500 million.  The press release provides as follows:

### GOOGLE FORFEITS $500 MILLION GENERATED BY ONLINE ADS & PRESCRIPTION DRUG SALES BY CANADIAN ONLINE PHARMACIES
*Internet search engine accepted advertisements from online Canadian pharmacies that targeted U.S. consumers and illegally imported controlled and non-controlled prescription drugs into the United States*

PROVIDENCE, R.I. – Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the U.S., announced Deputy Attorney General James M. Cole; Peter F. Neronha, United States Attorney for the District of Rhode Island; and  Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI).  The forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program, plus gross revenue made by  Canadian pharmacies from their sales to U.S. consumers.

The shipment of prescription drugs from pharmacies outside the United States to customers in the U.S. typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs , the Controlled Substances Act. Google was aware as early as 2003, that generally, it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada.

The importation of prescription drugs to consumers in the United States is almost always unlawful because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved because the drugs may not meet FDA's labeling requirements; may not have been manufactured, stored,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and distributed under proper conditions; and may not have been dispensed pursuant to a valid prescription. While Canada has its own regulatory rules for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada which lack adequate pharmacy regulations.

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General James Cole. "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers," said Peter F. Neronha, United States Attorney for the District of Rhode Island. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior.  It is about holding Google responsible for its conduct by imposing a $500 Million forfeiture, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

"Today's agreement demonstrates the commitment of the Food and Drug Administration to protect the US consumer and hold all contributing parties accountable for conduct that results in vast profits at the expense of the public health," said Kathleen Martin-Weis, Acting Director of FDA's Office of Criminal Investigations (OCI). "The result of this investigation has been a fundamental transformation of Internet pharmacy advertising practices, significantly limiting promotion to US consumers by rogue online pharmacies. This accomplishment could not have been possible without the resourceful commitment of the Rhode Island United States Attorney's Office, as well as the tireless efforts of our law enforcement partners detailed to the OCI Rhode Island Task Force."

An investigation by the United States Attorney's Office in Rhode Island and the FDA/OCI Rhode Island Task Force revealed that as early as 2003, Google was on notice that online Canadian pharmacies were advertising prescription drugs to Google users in the United States through Google's AdWords advertising program. Although Google took steps to block pharmacies in countries other than Canada from advertising in the U.S. through AdWords, they continued to allow Canadian pharmacy advertisers to target consumers in the United States. Google was aware that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies, and that many of the pharmacies distributed prescription drugs, including controlled prescription drugs, based on an online consultation rather than a

- 18 -

valid prescription from a treating medical practitioner. Google was also on notice that many pharmacies accepting an online consultation rather than a prescription charged a premium for doing so because individuals seeking to obtain prescription drugs without a valid prescription were willing to pay higher prices for the drugs.

Further, from 2003 through 2009, Google provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements, and in improving the effectiveness of their websites.

In 2009, after Google became aware of the investigation by the Rhode Island U.S. Attorney's Office and the FDA/OCI Rhode Island Task Force of its advertising practices in the online pharmacy area, and as a result of that investigation, Google took a number of steps to prevent the unlawful sale of prescription drugs by online pharmacies to U.S. consumers. Among other things, Google began requiring online pharmacy advertisers to be certified by the National Association of Boards of Pharmacy's *Verified Internet Pharmacy Practices Sites* program, which conducts site visits; has a stringent standard against the issuance of prescriptions based on online consultations; and, most significantly, does not certify Canadian online pharmacies. In addition, Google retained an independent company to enhance detection of pharmacy advertisers exploiting flaws in the Google's screening systems.

Under the terms of an Agreement signed by Google and the Government, Google acknowledges that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the Company accepts responsibility for this conduct. In addition to requiring Google to forfeit $500 million, the Agreement also sets forth a number of compliance and reporting measures which must be taken by Google in order to insure that the conduct described in the Agreement does not occur in the future.

The investigation of Google had its origins in a separate, multimillion dollar financial fraud investigation unrelated to Google, the main target of which fled to Mexico. While a fugitive, he began to advertise the unlawful sale of drugs through Google's AdWords program. After being apprehended in Mexico and returned to the United States by the United States Secret Service, he began cooperating with law enforcement and provided information about his use of the AdWords program. During the ensuing investigation of Google, the government established a number of undercover websites for the purpose of advertising the unlawful sale of controlled and non-controlled substances through Google's AdWords program.

58.    An Associated Press article titled "Google Gets a Wake-Up Call on Questionable

Ads" published on August 24, 2011 discussed the harm to Google's reputation arising out of the

wrongful actions and the NPA: "the potential damage to Google's reputation may be more troubling to the company than the amount of money it's paying to sweep the problem under the rug."

59.     That same sentiment was echoed by Oppenheimer & Co. analyst Jason Helfstein in an August 25, 2011 *Los Angeles Times* article entitled "Google to Pay Penalty for Ads; The Firm Agrees to a $500-million Fine for Running Ads From Canadian Pharmacies" in which the analyst reportedly expressed his belief that the fine was the least of Google's troubles, and "what is more distressing to Google is the potential blow to its reputation."

60.     On August 25, 2011, *The Wall Street Journal* published an article entitled "Repentant Google Settles on Drug Ads" stating, in relevant part, that:

> In a rare public mea culpa, Google Inc. agreed to pay $500 million to avoid Justice Department prosecution on charges that it knowingly accepted illegal advertisements from Canadian online pharmacies for years.
>
> With the long-awaited settlement Wednesday, the Mountain View, Calif., company said it banned advertising of prescription drugs by Canadian pharmacies in the U.S. "some time ago." However, it said that "**it's obvious with hindsight that we shouldn't have allowed these ads on Google in the first place.**"
>
> *     *     *
>
> Google executives testified repeatedly before Congress in the mid-2000s that they had rigorous controls in place to prevent unlicensed online pharmacies from advertising on Google.
>
> But in legal documents released on Wednesday, the government painted a starkly different picture, depicting a company that was willfully turning a blind eye to such efforts and, at times, even assisting them. It cited internal emails from Google employees discussing the tactics used by illicit pharmacies to circumvent its controls. Other seemed to suggest in emails that they were actively working with illicit advertisers to prevent their ads from being disqualified.
>
> *     *     *
>
> Over the years, Google executives repeatedly said that unlicensed pharmacies didn't advertise on Google. In 2005, Andrew McLaughlin, then a Google executive and later a White House official, told a congressional committee that "Google has implemented a rigorous third-party review and verification process that allows only licensed pharmacies and pharmacists to display advertisements in the United States."

- 20 -

He echoed earlier congressional testimony in 2004 by another then-Google executive, Sheryl Sandberg. [Emphasis added.]

61.     In addition to the significant harm caused to the Company's reputation and the $500 million fine, Google has suffered damages arising out of the costs required to defend itself against the government's investigation and the excessive compensation paid to the Senior Executive Defendants who were breaching the fiduciary duties to the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

62.     Plaintiff brings this shareholder derivative action on behalf of Google to redress injuries suffered, and to be suffered by the Company.  Plaintiff will adequately and fairly represent the interests of Google in enforcing and prosecuting its rights.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

63.     Plaintiff made a demand on the Board to take steps to investigate and hold the senior executives and directors responsible for Google's violations of the Drug Marketing Statutes accountable for their conduct by taking appropriate action to obtain a recovery for the Company and having the Board take additional steps to prevent the recurrence of similar wrongdoing in the future.

64.     On April 11, 2012 the Board constituted the Committee consisting of director Diane B. Greene ("Greene") and defendant Mather to investigate the matter, but retained ultimate authority over any decision to be made with respect to those claims.

65.     Collins Seitz, Jr., of the law firm Seitz Ross Aronson & Moritz LLP ("Seitz Ross"), counsel for the Committee, wrote a letter (a copy of which is attached hereto as Exhibit 1) to Plaintiff's counsel, and other law firms who had made demand on behalf of their clients, refusing the demands in their entirety (*i.e.*, the Demand Refusal Letter or the "DRL") which referred generally to the 149-page Committee Report, a copy of which was not made public. Since that time, the Board has acted consistently with the position articulated in the Demand Refused Letter and has failed to take the steps requested in the demand letter.

66.     The Demand Refused Letter failed to provide a proper foundation for refusing the Demand for at least the following reasons:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(A)     The decision to refuse the Demand was made by the Board, rather than the Committee, and the DRL failed to assess the independence of the Board members.  In fact, a majority of the Board is not independent.  The Board is comprised of the following ten (10) directors: Page, Brin, Schmidt, Doerr, Greene, Hennessy, Mather, Otellini, Shriram, and Tilghman.  Although the Demand Refused Letter acknowledges that defendants Page, Brin and Schmidt are not independent because of their status as senior executives of the Company, the DRL incorrectly concludes that a majority of the Board, *i.e.*, at least six of its members are independent.  That is not correct since at least the following eight Board members are, in fact, neither disinterested nor independent:

(I)     Defendants Page, Brin and Schmidt participated in the wrongful conduct alleged herein as senior executives of Google and as members of the EMG which, as discussed above (¶¶42-50), the defendants themselves and the Company admit that they were actively involved in the decision to allow Canadian online pharmacies to use the Company's AdWords platform to target advertising to U.S. consumers.  Accordingly, defendants Page, Brin and Schmidt face a substantial threat of liability for those actions and were not disinterested for purposes of considering the Demand.  In addition, defendants Page, Brin and Schmidt lack independence as directors as a result of their senior executive positions with the Company and their long history of working together as senior executives at Google and, therefore, would be unwilling to bring suit against each other.  Indeed, Schmidt has described Page and Brin as his "best friends" and Page and Brin have been working closely together since founding Google out of their college dorm rooms at Stanford.   Moreover, Schmidt would

- 22 -

not risk his position at Google and his control over the Company

through his 9.5% voting share along with that of Page's and Brin's

52.4% voting control by agreeing to bring suit against either of the

co-founders.  Schmidt also receives payments from Google for two

aeroplanes in which he has a financial stake.  In fiscal year 2011

alone, Google paid Schmidt $380,000 for the Company's use of

those aircraft.

(II)    Defendant Hennessy is the President of Stanford University and

defendant Shriram serves on the University's board of trustees.

Both defendants Page and Brin are Stanford alumni.  Since 2006,

Google, at the direction of defendants Page, Brin and Schmidt,

has donated approximately $14.7 million dollars to Stanford

University.  As the President and a trustee of Stanford whose

duties include raising money for the University, defendants

Hennessy and  Shriram would not risk voting to proceed with the

Demand for fear of losing Google's substantial donations to

Stanford and potentially jeopardizing their positions at the

University.

(III)   Defendant Tilghman is the President of Princeton University.

Defendant Schmidt, a Princeton alumnus, has donated tens of

millions of dollars to Princeton University.  For example, on

October 13, 2009, Princeton announced that Schmidt and his wife

Wendy had created a $25 million endowment fund at Princeton.

Defendant Tilghman was quoted in the press release at stating:

"We are deeply grateful to Eric and Wendy not only for providing

this support, but for providing the capacity and flexibility to make

investments that are likely to have the broadest and most

transformative impact."  Defendant Schmidt was also a trustee of

- 23 -

1    Princeton between 2004 to 2008, during which time he exercised

2    substantial control over the compensation and employment of

3    defendant Tilghman as the University's President.  Accordingly,

4    for reasons similar to those of defendants Hennessy and Shriram,

5    defendant Tilghman was unable to independently consider the

6    Demand.

7    (IV)  Defendant Doerr is a general partner at the venture capital firm

8    Kleiner Perkins.  Doerr has solicited and obtained substantial

9    investments from Google, at the direction of defendants Page, Brin

10   and Schmidt, for companies in which Kleiner Perkins' funds

11   possess a financial interest.  Doerr is a managing director for the

12   related Kleiner Perkins' funds.  For example, in 2007 Google

13   purchased Peakstream, Inc. for $20.3 million and Kleiner Perkins

14   received 24.5% of that amount (approximately $5 million).

15   Among the many other investments Google has made with Kleiner

16   Perkin's affiliates, as disclosed in the Company's 2012 Proxy, in

17   August 2011, Google committed to invest up to $75 million in a

18   Kleiner Perkin fund for which Doerr is a managing director.

19   Accordingly, Doerr was unable to independently consider the

20   Demand.

21   (V)   Greene, who became a member of the Board effective on January

22   12, 2012, was granted $1 million in Google Stock Units (which

23   entitle the holder to Class A common stock) on February 1, 2012

24   which vest over the course of four years provided Greene remains

25   as a member of the Board during that time.  Accordingly, Greene

26   had a financial incentive to not recommend that litigation be

27   brought against the Senior Executive Defendants considering their

28   control over Google and their ability to remove her from the

- 24 -

1        Board.  Thus, Greene was unable to serve as an independent

2        member of the Committee and as a Board member was unable to

3        independently consider the Demand.

4    (B)    The DRL fails to assess the independence of the Committee.

5    (C)    The DRL limits its analysis of the independence issue to a conclusion that

6        Seitz Ross, the Committee's counsel, is independent because it has "never

7        previously represented Google or Google's Board."  This analysis is

8        flawed for at least the following reasons:

9        (I)    It fails to analyze or discuss whether Seitz Ross has ever

10            represented any of the Board members in their individual capacity,

11            which is the capacity in which they would be named as defendants

12            in any action or lack independence to properly pursue the claims

13            asserted herein.

14        (II)    It fails to analyze or discuss whether Seitz Ross has ever

15            represented any other entity in which any of the Board members

16            are control persons.

17        (III)    It pivots independence on a lack of past representations of Google

18            while the pertinent issue is whether Seitz Ross will be precluded

19            from accepting any *future* engagements from Google and, if so, for

20            what period of time.

21        (IV)    It is the independence of the Board rather than the independence of

22            its counsel which is critical to analyzing the independence issue

23            especially where, as here, Seitz Ross was not responsible for the

24            investigation but merely assisted the Board acting through the

25            Committee in conducting the investigation.  Indeed, according to

26            the DRL, it was only after the Committee determined that the

27            Demand should be refused that Seitz Ross was asked to draft the

28            Report.

- 25 -

(D)     The DRL's conclusion that the Committee "found no wrongdoing or culpability by Google's directors or officers in connection with Google's acceptance of Canadian online pharmacy advertising" is directly contrary to the statement by U.S. Attorney Peter Nerohna (¶46, *supra*) and from Congressional testimony (¶¶38-39 and 42-43) reflecting the conscious disregard of known facts and direct participation of Google executives in facilitating the illegal sale of Canadian pharmaceutical products in the United States.  The DRL does not explain why the statement of Peter Nerohna was incorrect and he does not appear among the list of persons interviewed by the Committee.

(E)     The DRL's conclusion that Google's senior management "acted in good faith" fails to explain what standard or definition it uses for the term "good faith."  Later in the same paragraph, the DRL seems to equate "good faith" with "what they considered to be in the best interests of the Company." However, as a matter of public policy and Delaware law, engaging in illegal conduct can never be considered something which is in the best interests of an enterprise.   Instead, the term "good faith" has a specific meaning under Delaware law and senior executives (and directors) whose conduct is either grossly negligent or consciously disregards known risks can not be considered good faith.

(F)     The DRL references legal advice purportedly sought in connection with the wrongful conduct but does not explain from whom that advice was sought or what advice was given.

(G)     The DRL fails to explain why the online pharmacy issue failed to reach the Board level until after Google learned of the government investigation or how the failure to reach the Board level until that time was consistent with the Board's responsibility to oversee the Company's operations.

(H)     The DRL's consideration of the extensive remedial action engaged in by the Company *after* the DOJ investigation and the NPA ignored the importance of the Board and senior management needing to be proactive in preventing Google from engaging in unlawful conduct rather then simply reacting to government investigations.

(I)     The Report failed to consider whether insurance coverage would be available to compensate the Company in the event a Google shareholder, *i.e.*, Plaintiff, rather than the Company itself, brought the underlying action.

(J)     The DRL failed to quantify the amount of time and resources necessary to bring the claims which are the subject of the Demand.

(K)     The DRL speculatively claims that litigation would harm Google employee morale while failing to take into account the benefits of the likely reforms and cash recovery that would benefit the Company through the prosecution of derivative claims.

(L)     The DRL fails to state whether the twelve (12) Google employees interviewed by the Committee represents the universe of Google employees having knowledge of the wrongdoings at issue in the NPA and this action or how those individuals compare with the universe of people interviewed by the DOJ in connection with its investigation.

(M)     The DRL indicates that none of Google's outside contractors or service providers were interviewed in connection with the Committee's work.

(N)     The Committee's failure to make the Committee Report public standing alone demonstrates that the underlying investigation reflected in the Committee Report was not the product of good faith and due care and did not reach a reasonable result.

67.     Defendants as directors of Google knew or were at the very least on notice of the controversy surrounding the illegal sale of drugs online as a result of the numerous press articles

- 27 -

written in publications such as *The Wall Street Journal*, the three separate Congressional committee investigations at which Google provided testimony on the subject and the FDA's and other government agencies' efforts to dissuade the large search engine from providing advertising for rogue pharmacies.  Notwithstanding the obvious risks posed to Google and its shareholders as a result of the Company providing advertising for foreign online pharmacies and the intense scrutiny of the issue in both the press and by the U.S. government, Defendants failed to implement a system of controls designed to monitor and/or mitigate those risks.  Although the Company retained Square Trade and Pharmacy Checker to verify online pharmacy there was no Board oversight as to whether those programs were, in fact, effective.  Indeed, the Company's Demand Refusal Letter admits that the Board did not consider the online pharmacy issues until they were brought to the Board's attention after the Company became aware of the government's investigation.  Accordingly, Defendants are substantially liable as a result of their failure to perform their oversight duties as directors of the Company, for failing to insure the Company's compliance with the Drug Marketing Statutes and also for failing to ensure that a reasonable information and reporting system existed in order to elevate material issues to the Board.

68.    Google's Board was unable to make an impartial decision as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or their complete failure to perform their oversight duties to the Company, failure to oversee the Company's compliance with the Drug Marketing Statutes and systemic failure to assure that a reasonable information and reporting system existed, and/or (2) are not independent from the Senior Executive Defendants who otherwise face a substantial likelihood of liability for their roles in causing the Company to advertise for Canadian online pharmacies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## CLAIM FOR RELIEF
### Breach of Fiduciary Duty

2      69.     Plaintiff repeats and realleges each and every allegation made above as if fully set

3  forth herein.

4      70.     Defendants owed Google and its shareholders fiduciary duties of loyalty

5  (including duties of candor and good faith) and care.  Pursuant to those duties to Google and its

6  shareholders, Defendants were required to ensure that Google complied with all federal laws

7  relating to the importation of drugs into the U.S. and were required to maintain controls and

8  policies to assure Google complied with those laws.

9      71.     The Senior Executive Defendants, however, breached their duty of loyalty by

10  consciously failing to stop the Company from engaging in the unlawful conduct described herein

11  and for affirmatively permitting Canadian online pharmacies to use AdWords to advertise in the

12  U.S.

13      72.     Defendants as directors of Google, breached their fiduciary duty of care in failing

14  to perform their oversight duties as directors of the Company, for failing to insure the

15  Company's compliance with the Statute and also for failing to ensure that a reasonable

16  information and reporting system existed in order to elevate material issues to the Board.

17      73.     As a result of Defendants' breaches of their fiduciary duties, Google has suffered

18  significant harm and is entitled to damages.

19
## PRAYER FOR RELIEF
20
**WHEREFORE,** Plaintiff demands judgment as follows:
21
22      A.     Declaring that the Plaintiff may maintain this action on behalf of Google and that

Plaintiff is an adequate representative;
23
24      B.     Declaring that Defendants have breached, participated and/or aided and abetted

the breach of their fiduciary duties to Google;
25
26      C.     Entering judgment against Defendants and directing Defendants to account to

27  Google for all damages, and any interest thereon, sustained by the Company by reason of the

wrongdoing alleged herein;
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        D.       Directing Google to take all necessary steps to reform and improve its corporate

2 governance and internal procedures to comply with applicable law and to protect the Company

3 and its shareholders from a repeat of the wrongful conduct alleged herein;

4        E.       Ordering Defendants to reimburse the Company for all compensation they

5 received as a result of the wrongful conduct alleged herein;

6        F.       Awarding Plaintiff the costs and disbursements of this action, together with

7 reasonable attorneys' fees and the reimbursement of expenses; and

8        G.       Granting such other further relief as the Court may deem just and proper.

9 **DEMAND FOR JURY TRIAL**

10        Plaintiff demands a trial by jury on all issues.

11 Dated: May 2, 2013        **ABRAHAM, FRUCHTER & TWERSKY, LLP**

12

13        By: _____

14        Ian D. Berg   (Bar No. 263586)
       Takeo A. Kellar (Bar No. 234470)

15        12526 High Bluff Drive, Suite 300
       San Diego, CA 92130

16        Tel:   (858) 792-3448
       Fax:   (858) 792-3449

17        *iberg@aftlaw.com*
       *tkellar@afilaw.com*

18

19        **ABRAHAM, FRUCHTER & TWERSKY, LLP**
       Jeffrey S. Abraham

20        Lawrence D. Levit
       Atara Hirsch

21        Philip T. Taylor
       One Penn Plaza; Suite 2805

22        New York, New York 10119
       Tel:   (212) 279-5050

23        Fax:   (212) 279-3655

24        *jabraham@aftlaw.com*
       *llevit@aftlaw.com*

25        *ahirsch@aftlaw.com*
       *ptaylor@aftlaw.com*

26

27        *Counsel for Plaintiff*

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

Jay L. Smith, Chairman of the Board of Trustees of the City of Orlando Police Pension Fund (the "Orlando Police Fund"), with authority to act on the Orlando Police Fund's behalf, hereby affirms that I have read the Verified Shareholder Derivative Complaint (the "Complaint") in this action.   The matters alleged in the Complaint are true insofar as they concern the Orlando Police Fund.   Upon information and belief, the matters alleged in the Complaint are true insofar as they relate to the acts and deeds of other persons.

I verify under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of April, 2013, at _____Orlando_____, Florida

_____

Jay Smith

EXHIBIT 1

# SEITZ ROSS
# ARONSTAM
# & MORITZ LLP

100 S. West Street, Suite 400
Wilmington, DE  19801
Telephone  302.576.1600
Facsimile  302.576.1100
www.seitzross.com

**Collins J. Seitz, Jr.**
cseitz@seitzross.com
302.576.1601

January 28, 2013

**BY EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Jeffrey S. Abraham, Esq.
Abraham, Fruchter
 & Twersky, LLP
One Penn Plaza, Suite 2805
New York, NY  10119

Eduard Korsinsky, Esq.
Levi & Korsinsky, LLP
30 Broad Street
24th Floor
New York, NY  10004

Carmella P. Keener, Esq.
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899

Robert B. Weiser, Esq.
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19312

Christine S. Azar, Esq.
Labaton Sucharow
300 Delaware Avenue
Suite 1225
Wilmington, DE  19801

Darren T. Kaplan, Esq.
Chitwood Harley Haynes LLP
1350 Broadway, Suite 908
New York, NY  10018

Richard A. Maniskas, Esq.
Ryan & Maniskas, LLP
995 Old Eagle School Road
Suite 311
Wayne, PA  19087

Gregg S. Levin, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  2946

   *Re: Google Inc. Stockholder Demands*

Dear Counsel:

   I write on behalf of the Board of Directors (the "Board") of Google Inc. ("Google" or the

"Company") in response to purported stockholder demands submitted by Judy Wang by letter

dated September 8, 2011; City of Orlando Firefighters' Pension Fund by letter dated January 13,

2012; DeKalb County Pension Fund by letter dated September 25, 2012; and Ira Szmerkes,

January 28, 2013
Page 2

LAMPERS and the Pompano Beach Police & Firefighters' Retirement System by letter dated

October 16, 2012 (collectively, the "Demands").  The Demands relate to Google's acceptance of

advertising by Canadian online pharmacies targeting and advertising drugs to Google users in the

United States through Google's AdWords advertising program and August 2011 entry into a

non-prosecution agreement with the United States government (the "NPA"), including Google's

agreement to a $500 million forfeiture.  The Demands request that Google's Board investigate

the allegations made in the Demands; if warranted, institute litigation against management or

other persons responsible to obtain a recovery for the Company; seek contribution or

indemnification from Mr. Page and others; and take certain remedial measures to prevent a

recurrence of the alleged wrongdoing identified in the Demands.

The Board has determined to refuse the Demands in their entirety.

Google's Board and the Special Committee

The Board is comprised of the following ten directors:  Larry Page, Sergey Brin, Eric E.

Schmidt, L. John Doerr, Diane B. Greene, John L. Hennessy, Ann Mather, Paul S. Otellini,

K. Ram Shriram, and Shirley M. Tilghman.  Other than Messrs. Page (Google's Chief Executive

Officer and a Google co-founder), Brin (Google co-founder and head of special projects), and

Schmidt (Executive Chairman of Google), the seven remaining directors are outside, non-

management, non-employee directors.

On April 11, 2012, the Board adopted a resolution creating a special committee (the

"Committee") comprised of two independent, outside directors:  Diane B. Greene and Ann

Mather.  The Board asked the Committee to consider the facts and circumstances surrounding

one of the demands and to recommend to the Board whether or not the actions demanded are in

the best interests of Google and its stockholders.  On October 24, 2012, the Board asked the

January 28, 2013
Page 3

Committee to consider the facts and circumstances surrounding additional related demand letters,

and to recommend to the Board whether the actions demanded in all such letters are in the best

interests of Google and its stockholders.

<u>The Committee's Investigation</u>

      The Committee retained Seitz Ross Aronstam & Moritz LLP ("Seitz Ross") to serve as

counsel to the Committee.  Seitz Ross has never previously represented Google or Google's

Board.  With the assistance of counsel from Seitz Ross, the Committee undertook a seven-month

investigation into the allegations of the Demands.  The investigation included extensive

document review and interviews of 17 individuals, including current and former Google

employees, in-house counsel, outside counsel, and one third-party pharmacy monitoring service.

A chart listing the interviews conducted is attached as Exhibit A hereto.

      Following earlier meetings of the Committee on May 24, 2012, June 26, 2012, September

11, 2012, October 17, 2012, and October 23, 2012, the Committee met telephonically on

November 8, 2012 to discuss the investigation.  The Committee discussed in detail the strengths

and weaknesses of the potential claims that Google might bring against its directors and officers

and third parties given the facts uncovered during the investigation and the likelihood of

achieving a significant recovery for the Company.  After discussion, the Committee determined

to recommend to the Board that the Demands be refused and that the Company not bring any

claims in response to the Demands because doing so would not be in the best interest of Google

and its stockholders.  The Committee requested that Seitz Ross prepare a draft report for review.

      On December 12, 2012, the Committee met telephonically and by GoToMeeting

conference.  Seitz Ross and the Committee members first reviewed in detail one additional

interview that had been completed since the last meeting, which had been rescheduled due to the

January 28, 2013
Page 4

effects of Hurricane Sandy, including their collective view that the additional interview

confirmed and reinforced the facts that the Committee had learned in previous interviews, and

did not change the Committee's recommendation.  The Committee and Seitz Ross then discussed

the draft report setting forth the Committee's findings, which Seitz Ross had circulated to the

Committee members in advance of the meeting.

     On December 14, 2012, the Committee finalized and approved its 149-page report

containing the Committee's findings and recommendation to the Board regarding the Demands.

The Committee's report was transmitted to the Board.

The Committee's Report and Recommendation

     As detailed in the report, the Committee found no wrongdoing or culpability by Google

directors or officers in connection with Google's acceptance of Canadian online pharmacy

advertising, and no evidence that Google senior management had any conflict of interest or stood

to benefit personally from Google's decisions regarding online pharmacy policy.  The

Committee found that Google senior management involved with Google's online pharmacy

policy decisions acted in good faith and followed a robust process that included consultations

with inside and outside counsel and elevation of key issues to the Executive Management Group

level.  While there was at times a vigorous internal debate at Google regarding online pharmacy

policy, the Committee concluded that this internal debate reflected good-faith differences of

opinion among senior executives who were all acting in what they considered to be the best

interests of the Company.

     Even though most of the online pharmacy policy decisions at issue were made at the

senior executive level and did not reach the Board, the Committee found that this did not reflect

a failure of controls or Board disablement from oversight.  The Company was expanding rapidly

January 28, 2013
Page 5

at the time and senior management sought and received legal advice.  And when online

pharmacy issues did reach the Board level soon after Google learned of the government

investigation, Google approached the matter seriously, undertaking extensive remedial action in

the wake of the DOJ investigation and the NPA, including (1) changing AdWords policy such

that it now forbids accepting advertisements from Canadian online pharmacies to run in the

United States; (2) requiring third-party pharmacy verification by the Verified Internet Pharmacy

Practice Sites (VIPPS) program; (3) adopting back-end monitoring by LegitScript; (4) continuing

to invest in enhancing the Company's technical tools for enforcing policy compliance;

(5) terminating or taking other disciplinary action against certain Google employees; (6) bringing

litigation against certain online pharmacies for violating Google policy; (7) undertaking to

maintain and update Company compliance programs and policies; (8) cooperating with the

Federal Food and Drug Administration ("FDA"), including sending the FDA quarterly reports

that include referral of questionable online pharmacy ads for further investigation; (9) removing

ad approval decisions from the sales team; (10) creating a "Red Alert" team to respond to

potential policy problems as they emerge; and (11) enhancing sales employee training regarding

potential liability.

The Committee also considered potential claims against third parties, including Canadian

online pharmacies, Google's third-party verifiers, and attorneys from whom Google received

legal advice.  Such claims would include causes of action for breach of contract, contribution,

and professional malpractice.

The Committee also considered, among other things:  (1) the likelihood that pursuing the

litigation demanded would involve a substantial commitment of Company time and resources;

(2) the risk that litigation against the Company's founders and current or former directors or

January 28, 2013
Page 6

officers could cause distraction or impair morale at a time when the Company is enjoying

economic success; and (3) the size of the $500 million forfeiture and the potential disruption

from bringing suit viewed in the context of Google's scope as a business that generated revenues

in excess of $37 billion in 2011.

The Committee concluded that pursuing the claims raised in the Demands would not be

in the best interests of Google and its stockholders.  The Committee recognized that Google's

online pharmacy policy decisions resulted in the NPA and the associated $500 million forfeiture.

After investigation, the Committee determined that the Company had appropriately responded to

this experience, including through disciplinary action against certain employees and significant

enhancements to the Company's online pharmacy policy and compliance programs.  As a result

of these and other changes that the Company implemented, the Committee concluded that

Google faces much less risk today in the online pharmacy area as a result and therefore

recommended that the Board conclude that no further remedial actions are required at this time.

The Board's January 23, 2013 Meeting

The Board considered the Special Committee's recommendation at its January 23, 2013

Board meeting.  Consideration of the Committee's recommendation occurred in executive

session, without Messrs. Page, Brin or Schmidt attending.  After discussion, the participating

directors voted unanimously to refuse the Demands in their entirety.

Very truly yours,

Collins J. Seitz, Jr.

## EXHIBIT A

### List of Interviews Conducted

| | | |
|---|---|---|
| 1 | Mary Ann Belliveau | Former Vertical Market Manager, Healthcare |
| 2 | Sergey Brin | Google co-founder; head of special projects |
| 3 | John Horton | President of LegitScript |
| 4 | Alana Karen | Policy Manager |
| 5 | Alexander MacGillivray | Former Deputy General Counsel for Products and IP |
| 6 | Anthony Maroon | Former Account Manager, Healthcare Vertical |
| 7 | Larry Page | Chief Executive Officer; Google co-founder |
| 8 | Rowena Paz | Customer Service Representative |
| 9 | Kulpreet Rana | Former Google Director of Legal Affairs and Director of Intellectual Property Affairs; Google's first in-house lawyer |
| 10 | Records Custodian (Rebecca Engrav and Pravin Rao) | Perkins Coie attorneys |
| 11 | Sheryl Sandberg | Former Vice President of Global Online Sales & Operations |
| 12 | Eric Schmidt | Executive Chairman |
| 13 | Kent Walker, Adam Barea, Lisa Lee, and Julie Hanningan | Senior Vice President and General Counsel, Senior Litigation Counsel, Director of Internal Audit, member of Products and Agreements Legal Team, respectively |