IAN D. BERG   (Bar No. 263586)
TAKEO A. KELLAR   (Bar No. 234470)
ABRAHAM, FRUCHTER
      & TWERSKY, LLP
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 792-3448
Fax:     (858) 792-3449
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

*Counsel for Plaintiff City of*
*Orlando Police Pension Fund*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ORLANDO POLICE PENSION FUND by its Trustees, derivatively on behalf of GOOGLE INC., <br><br> Plaintiff, <br> v. <br><br> LAWRENCE E. PAGE, SERGEY BRIN, ERIC E. SCHMIDT, L. JOHN DOERR, JOHN L. HENNESSY, ANN MATHER, PAUL S. OTELLINI, K. RAM SHRIRAM and SHIRLEY TILGHMAN, <br><br> Defendants, <br><br> and <br><br> GOOGLE, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. 4:13-CV-02038-PJH <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> Date:        July 24, 2013 <br> Time:       9:00 a.m. <br> Judge:      Hon. Phyllis J. Hamilton |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

ISSUES TO BE DECIDED (Local Rule 7-4(a)(3)) ..................................................... v

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...............................................................................................3

ARGUMENT ..................................................................................................................6

I.      Plaintiff Satisfies The Rule 23.1 Ownership Requirements ...............................6

II.     Plaintiff Has Properly Alleged That Defendants Wrongfully
        Refused Its Demand ..............................................................................................10

        A.      Rule 23.1 Requires Plaintiff To Allege
                Particularized Facts, But Not Evidence, Supporting
                A Reasonable Doubt Of Wrongful Refusal Of The
                Demand ......................................................................................................10

        B.      Plaintiff Has Properly Alleged Particularized Facts
                Demonstrating A Reasonable Belief That Demand
                Has Been Wrongfully Refused ...................................................................11

                1.      Plaintiff Does Not Concede That the Board
                        Acted Independently In Considering
                        Plaintiff's Demand ..........................................................................11

                2.      Plaintiff Has Alleged Particularized Facts
                        Demonstrating That The Board Failed To
                        Act With Good Faith In Considering The
                        Demand .............................................................................................16

                3.      Plaintiff Has Alleged Particularized Facts
                        Demonstrating That The Board Failed To
                        Act In An Informed Manner And With Due
                        Care .................................................................................................20

CONCLUSION ...............................................................................................................22

# TABLE OF AUTHORITIES

<u>**Case**</u>                                                                                                   <u>**Page**</u>

*Abella v. Universal Leaf Tobacco Co., Inc.,*
   546 F. Supp. 795 (E.D. Va. 1982) ...................................................................... 17

*Aronson v. Lewis,*
   473 A.2d 805 (Del. 1984) ................................................................................... 11

*Belova v. Sharp,*
   2008 U.S. Dist. LEXIS 19880 (D. Or. Mar. 13, 2008) ......................................... 7

*Behradrezaee v. Dashtara,*
   910 A.2d 349 (D.C. 2006) ......................................................................... 13, 14, 15

*Biondi v. Scrushy,*
   820 A.2d 1148 (Del. Ch. 2003).......................................................................... 19

*Booth Family Trust v. Jeffries,*
   640 F.3d 134 (6th Cir. 2011) ............................................................................. 15

*Brehm v. Eisner,*
   746 A.2d 244 (Del. 2000) ............................................................................ 10, 11

*Cede & Co. v. Technicolor,*
   634 A.2d 345 (Del. 1993) ................................................................................... 11

*Copeland v. Lane,*
   2012 WL 4845636 (N.D. Cal. Oct. 10, 2012)...................................... 13, 18, 20, 21

*Copeland v. Lane,*
   2013 U.S. Dist. LEXIS 65742 (N.D. Cal. May 6, 2013) ..................................... 13

*Daily Income Fund, Inc. v. Fox,*
   464 U.S. 523 (1984)............................................................................................ 6

*Desimone v. Barrows,*
   924 A.2d 908 (Del. Ch. 2007)......................................................................... 7, 8

*Graham v. Allis-Chalmers Mfg. Co.,*
   188 A.2d 125 (Del. 1963) ................................................................................... 18

*Grimes v. Donald,*
   673 A.2d 1207 (Del. 1996) ...................................................................... 11, 12, 22

*In re Accuray, Inc. S'holder Derivative Litig.,*
   757 F. Supp. 2d 919 (N.D. Cal. 2010) ................................................................. 9

*In re Bank of N.Y. Derivative Litig.,*
   320 F.3d 291 (2d Cir. 2003)................................................................................. 9

*In re Enron Corp. Sec., Deriv. & ERISA Litig.,*
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ............................................................... 10

*In re MRV Communs., Inc.*,
  2010 U.S. Dist. LEXIS 46946 (C.D. Cal. May 10, 2010) ..................................... 10

*In re Oracle Derivative Litig.*,
  824 A.2d 917 (Del. Ch. 2003) ................................................................ 16, 21

*In re Par Pharmaceutical, Inc. Derivative Litig.*,
  750 F. Supp. 641 (S.D.N.Y. 1990)............................................................ 18, 19

*In re PSE&G Shareholder Litig.*,
  173 N.J. 258 (N.J. 2002) ............................................................................. 12

*In re SFBC Int'l Inc. Sec. & Deriv. Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) ............................................................. 17

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ...................................................................... 11

*In re Tower Air, Inc.*,
  416 F.3d 229 (3d Cir. 2005)......................................................................... 18

*In re Zoran Corp. Derivative Litig.*,
  511 F. Supp. 2d 986 (N.D. Cal. 2007) ................................................ 6, 7, 10

*Joy v. North*,
  692 F.2d 880 (2d Cir. 1982)................................................................... 18, 19

*Kamen v. Kemper Fin'l Servs.*,
  908 F.2d 1338 (7th Cir. 1990) .................................................................... 12

*Kamen v. Kemper Fin'l Servs.*,
  500 U.S. 90 (1991)...................................................................................... 11

*Levine v Smith*,
  591 A.2d 194 (Del. 1991) ............................................................................ 12

*London v. Tyrrell*,
  2010 Del. Ch. LEXIS 54 (Del. Ch. Mar. 11, 2010)........................... 16, 17, 20, 21

*Maclary v. Pleasant Hill, Inc.*,
  109 A.2d 830 (Del. Ch. 1954)........................................................................ 9

*Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*,
  2009 WL 1795574 (D. Or. June 24, 2009) ................................................. 21

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007).......................................................................... 7

*Scattered Corp. v. Chicago Stock Exch., Inc.*,
  701 A.2d 70 (Del. 1997) .................................................... 11, 12, 13, 14, 15, 22

*Scott v. Lackey*,
  2012 NCBC 58 (N.C. Super. Ct. 2012) ..................................................... 16

*Seminaris v. Landa*,
  662 A.2d 1350 (Del. Ch. 1995)..................................................................... 15

*Smith v. Van Gorkom,*
    488 A.2d 858 (Del. 1985) ..................................................................... 15

*Spiegel v. Buntrock,*
    571 A.2d 767 (Del. 1990) ..................................................................... 12

*Stepak v. Addison,*
    20 F.3d 398 (11th Cir. 1994) ............................................................... 15

*Sutherland v. Sutherland,*
    958 A.2d 235 (Del. Ch. 2008).............................................................. 21

*Thorpe v. CERBCO, Inc.,*
    611 A.2d 5 (Del. Ch. 1991)............................................................ 12, 14

*Zimmerman v. Braddock,*
    2005 Del. Ch. LEXIS 135 (Del. Ch. Mar. 3, 2010) ........................ 10, 11

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P. 15(a)(2).................................................................................22

Fed. R. Civ. P. 23.1 ........................................................................... *passim*

**OTHER AUTHORITIES**

John C. Coffee, *New Myths and Old Realities: The American Law Institute Faces the*
    *Derivative Action,* 48 Bus. Law. 1407 (1993) .......................................12

## ISSUES TO BE DECIDED (L.R. 7-4(a)(3))

1.      Does Plaintiff plead that it meets the contemporaneous ownership requirements of Federal Rule of Civil Procedure 23.1?

2.      Does Plaintiff allege with sufficient particularity facts to demonstrate that its litigation demand on Google's Board of Directors was wrongfully refused?

1    Plaintiff City of Orlando Police Pension Fund ("Plaintiff" or "Orlando Police")

2    respectfully submits this memorandum in opposition to the Motion To Dismiss ("Motion" or

3    "Mot.") the Verified Shareholder Derivative Complaint ("Complaint") filed by Nominal

4    Defendant Google Inc. ("Google" or the "Company") and Individual Defendants Lawrence E.

5    Page, Sergey Brin, Eric E. Schmidt, L. John Doerr, John L. Hennessy, Ann Mather, Paul S.

6    Otellini, K. Ram Shriram, and Shirley Tilghman (collectively "Defendants").

### INTRODUCTION

8    Google executives facilitated the illegal sale of Canadian pharmaceutical products in the

9    United States through Google's advertising platform, AdWords.   In a Non-Prosecution

10   Agreement ("NPA") with the United States Attorney's Office for the District of Rhode Island,

11   United States Department of Justice (the "DOJ"), Google acknowledged that it improperly

12   assisted Canadian online pharmacy advertisers to run advertisements that targeted the United

13   States through AdWords, and it agreed to forfeit a record-setting $500 million.  As declared by

14   U.S. Attorney Peter Neronha, based on the review of over 4 million documents and numerous

15   witness interviews, Google founder and Chief Executive Officer Larry Page "knew what was

16   going on."

17   Nonetheless, a two-person Special Committee appointed by Google's board of directors

18   (the "Board") to investigate the demand made by Plaintiff (the "Demand"), one of which is a

19   named defendant, "found no wrongdoing or culpability" by Google's directors or officers in

20   connection with the advertising and sale of illegal drugs.  The Board, purportedly acting on the

21   Special Committee's investigation, then refused Plaintiff's Demand.

22   Defendants assert that this decision by the Board to refuse Demand must be honored by

23   the Court based upon application of the business judgment rule.  Defendants, however, ignore

24   that the business judgment rule in this context is not a blank check for directors to refuse any and

25   all demands made on a board of directors.  Instead, the presumption of an appropriate exercise of

26   business judgment, which Defendants seek to apply, is contingent on the Board having carried

27   out its obligations with good faith and due care.

28   Here, there was neither good faith nor due care.  No one acting in good faith could

reasonably determine that illegal conduct acknowledged by the Company and resulting in a $500 million forfeiture was not the product of any "wrongdoing or culpability" on the part of the senior executives who actively managed the Company's operations.  No matter how arbitrary people may perceive our government to be, it makes no sense that such an enormous forfeiture, coupled with detailed findings of wrongdoings in the NPA, could have taken place without there being evidence of willful wrongdoing by senior executives at Google – and the U.S. Attorney responsible for the investigation pointed his finger directly at defendant Page.

Indeed, even assuming *arguendo* that a determination of no "wrongdoing or culpability" was possible under these circumstances -- and Plaintiff submits that it is not -- the six-page bare-bones demand refused letter (the "Demand Refusal Letter" or "DRL") does not adequately support such a determination.  This is especially true given that Defendants have refused to disclose the underlying Special Committee Report, and identify only the Google employees purportedly interviewed, but not the U.S. Attorney or outside vendors.  Defendants also fail to describe in detail the process that was undertaken by the Special Committee.  Instead, Defendants essentially ask that their good faith and due care be taken almost as a matter of faith, rather than as a reasoned analysis of the facts of this case.

Similarly infirm is Defendants' contention that Plaintiff's Demand concedes the independence of the Special Committee and Board as a matter of law.  The Delaware Supreme Court has explicitly held that making a demand ***does not*** concede that a Board in fact acted independently.  Here, the Complaint adequately alleges particularized facts demonstrating reasonable doubt that the Special Committee and the Board acted independently based on the composition and complete lack of authority of the Special Committee.

In addition, Defendants erroneously contend that they are immune from any derivative action based on the failure of Plaintiff to meet the "continuous ownership" requirement of Rule 23.1 because Defendants' admittedly wrongful conduct first occurred in 2003, prior to the Company's initial public offering.  This novel interpretation of Rule 23.1 has been soundly rejected by the Delaware Supreme Court.  Instead, it is well-settled that shareholders have standing to challenge discreet transactions that occurred during their period of ownership, even if

similar misconduct or transactions occurred previously.   Indeed, Plaintiff Orlando Police purchased and held Google stock since May 2, 2005 -- and the admittedly improper conduct continued to occur through repeated transactions from 2005 through 2009.

Plaintiff Orlando Police made a proper Demand on the Google Board to hold its senior executive officers responsible for their wrongful conduct that led to the forfeiture of $500 million.   Because those executives include the Company's founders and directors who control the Company, the Board created a toothless Special Committee and pre-determined the outcome of a toothless investigation.   Defendants cannot now hide behind that this facade to claim a good faith exercise of business judgment when the Special Committee lacked independence and failed to conduct a meaningful and informed investigation with due care.   For these reasons, the action should proceed and defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

Google, a Delaware corporation, operates the world's most popular Internet search service.   ¶¶1, 24.[1]   Co-founded by defendants Page and Brin in 1998, Google derives the vast majority of its revenues from online advertising.   ¶¶13, 14, 24.   Google's primary advertising platform is the AdWords product, which is an auction-based advertising program allowing advertisers to place text-based and display ads on the Company's and its network members' websites.   ¶25.

Pursuant to the Federal Food, Drug and Cosmetic Act of 1938 (the "Act"), 21 U.S.C. §331(a) and (d), it is illegal for pharmacies located outside of the U.S. to ship prescription drugs into the U.S.   ¶27.   The Act seeks to protect U.S. consumers from drugs that have not been approved for sale by the U.S. Food and Drug Administration ("FDA") and that were manufactured outside of the FDA's jurisdiction.   *Id.*   Moreover, the FDA seeks to protect consumers from the practices employed by rogue pharmacies whereby prescription drugs are shipped solely on the basis of on an online consultation.   *Id.*   In addition, the Controlled Substances Act, 21 U.S.C. §801 *et seq.*, similarly seeks to protect U.S. consumers by regulating the manufacturing, importation and possession of certain controlled substances.   ¶28.   Thus, the

---

[1] All references to "¶__" are to paragraphs of the Complaint filed on May 2, 2013 (Dkt. No. 1).

Controlled Substances Act prohibits the importation of controlled substances into the United States (collectively with the Act, the "Drug Marketing Statutes").

From at least 2003 through 2009, Defendants were well aware that Canadian online pharmacies, which the Company specifically permitted to target advertising to U.S. consumers, were shipping drugs into the U.S. in violation of federal law.  ¶¶27, 39-46.  Google retained Square Trade Inc. ("Square Trade") between 2004 and 2006, and then PharmacyChecker.com LLC ("PharmacyChecker") in 2006, to verify online pharmacies as appropriate sellers of prescription drugs.  ¶36.  Yet, Google knowingly permitted Square Trade to verify Canadian online pharmacies that merely self-certified that they were in compliance with applicable U.S. regulations, without any independent corroboration; and, also Google knowingly permitted PharmacyChecker to certify Canadian online pharmacies that sold prescription drugs.  *Id.*

Throughout this time, Defendants received multiple external warnings that the unlawful advertising was occurring.  For example, the National Association of Boards of Pharmacy ("NABP") sent Google a letter on March 13, 2003, warning about the dangers of the rogue online pharmacies and the U.S. federal laws of which Google was violating.  ¶¶30-31.  A December 23, 2008 letter to Defendant Schmidt from the NABP similarly warned that Google's "sponsorship of these search results, and your third-party verification service's certification of these Web sites, aids in a business practice that is contrary to US law, unsafe, and deceptive to US patients."  ¶41.  Defendant Schmidt also received a letter on July 7, 2008, from Joseph A. Caliano, Jr. of the National Center on Addiction and Substance Abuse at Columbia University ("CASA"), warning that Google was "profiting from advertisements for illegal sales of controlled prescription drugs online."  ¶40.

Defendants were well aware that between 2003 and 2009 Google was allowing Canadian online pharmacies to target advertising to U.S. consumers, thereby facilitating the importation of controlled substances into the U.S. in violation of federal law.  ¶42.  During a Congressional hearing held on September 21, 2011, defendant Schmidt admitted that he knew Google was facilitating such unlawful conduct.  *Id.*  Knowledge of Google's misdeeds by the Company's senior management was also confirmed by Peter Neronha, U.S. Attorney for the District of

Rhode Island.  ¶46.  U.S. Attorney Neronha concluded that Defendant "Larry Page knew what was going on . . . [w]e simply know it from the documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."  *Id*.  The U.S. Attorney also stated "[s]uffice it to say that this is not two or three rogue employees at the customer service level doing this on their own . . . [t]his was a corporate decision to engage in this conduct."  *Id*.

In 2009, the DOJ and other government entities commenced criminal investigations into Google's illegal advertising practices.  ¶57.  Google did nothing to block Canadian online pharmacies from targeting advertisements to U.S. consumers until it became aware of the DOJ's investigation in 2009.  ¶51.  Even then, Google failed to take any action for many months.  *Id*.  Finally, on February 9, 2010, Google announced belated changes to the Company's Pharmacy Policy in the U.S and Canada which went into effect on February 23, 2010.  *Id*.

On August 24, 2011, the DOJ announced that Google had entered into the NPA with the DOJ in which Google agreed to forfeit $500 million for improperly facilitating the placement of advertisements from Canadian online pharmacies.  ¶¶4, 57.  Moreover, under the terms of an NPA signed by Google and the Government, "Google acknowledge[d] that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the Company accept[ed] responsibility for this conduct."  ¶57.

This forfeiture of $500 million represents one of the largest remedial forfeitures ever in the United States.  *Id*.  In addition to the significant harm caused to the Company's reputation and the $500 million fine, Google has suffered damages arising out of the costs required to defend itself against the government's investigation and the excessive compensation paid to the senior executive defendants who were breaching the fiduciary duties to the Company.  ¶61.

On January 13, 2012, Demand was made that the Board take steps to investigate and hold the senior executives and directors responsible for Google's violations of the Drug Marketing Statutes accountable for their conduct by taking appropriate action to obtain a recovery for the Company and having the Board take additional steps to prevent the recurrence of similar wrongdoing in the future.  ¶63.

At the time of the refusal of Plaintiff's Demand, the Board was comprised of the following ten (10) directors: Defendants Page, Brin, Schmidt, Doerr, Hennessy, Otellini, Shriram, Tilghman, and Mather; and non-defendant Diane B. Greene.  ¶66.  On April 11, 2012, the Board constituted the Special Committee consisting of director Greene and defendant Mather to investigate the matter, but retained ultimate authority over any decision to be made with respect to those claims.  ¶64.

On January 28, 2013, Collins Seitz, Jr., of the law firm Seitz Ross Aronson & Moritz LLP ("Seitz Ross"), counsel for the Special Committee, wrote a letter on behalf of the Board to Plaintiff's counsel, and other law firms who had made demand on behalf of their clients, refusing the demands in their entirety (*i.e.*, the Demand Refusal Letter) and referencing generally to the 149-page Committee Report, a copy of which was not made public.  ¶65.[2]  Since that time, the Board has acted consistently with the position articulated in the Demand Refused Letter and has failed to take the steps requested in the demand letter.  *Id*.

Plaintiff alleges that the Board has improperly refused and continues to refuse demand and, therefore, Plaintiff is filing this action in order to seek redress on behalf of the Company.  ¶¶6, 66-68.

## ARGUMENT

### I.   Plaintiff Satisfies The Rule 23.1 Ownership Requirements

To establish a shareholder's standing to bring a derivative action, a derivative complaint must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of."  Fed. R. Civ. P. 23(b)(1).  The purpose of this rule is "to prevent prospective plaintiffs from purchasing shares in a corporation with an eye to filing a derivative suit."  *In re Zoran Corp. Derivative Litig*., 511 F. Supp. 2d 986, 1009 (N.D. Cal. 2007) (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 n.6 (1984)).  Plaintiff Orlando Police has pled that it has been a shareholder of Google "continuously since May 2, 2005" (¶11), which is sufficient in this case to plead its contemporaneous ownership of Google stock under Rule 23.1.

---

[2] The Demand Refusal Letter is attached as Exhibit 1 to the Complaint.

1     It is well-settled that shareholders have standing to challenge *discrete transactions* that

2 occurred during their period of stock ownership, even if there occurred other, pre-ownership

3 transactions that were "similar or related to" the later "transactions or other conduct" being

4 challenged. *Desimone v. Barrows*, 924 A.2d 908, 925 (Del. Ch. 2007); *see also Zoran Corp.*,

5 511 F. Supp. 2d at 1010 (affirming that plaintiff had standing to assert claims regarding events

6 occurring after he acquired stock, despite the fact that similar conduct occurred before the

7 plaintiff's stock purchases); *Belova v. Sharp*, 2008 U.S. Dist. LEXIS 19880, at *10 (D. Or. Mar.

8 13, 2008) (granting leave to amend standing allegations to challenge transactions during stock

9 ownership, despite the fact that similar transactions occurred prior to plaintiff's stock

10 ownership); *Ryan v. Gifford*, 918 A.2d 341, 359, 361 (Del. Ch. 2007) (finding plaintiff had

11 standing to challenge transactions occurring after stock acquired).

12     Here, the transactions that Plaintiff challenges include Defendants' repeated and

13 conscious decisions that allowed Google to accept illegal advertisements from Canadian online

14 pharmacies, and failing to insure Google's compliance with federal laws. *See, e.g.*, ¶¶70-72.

15 These challenged acts occurred on multiple occasions following Plaintiff's acquisition of Google

16 Stock on May 2, 2005, including, each time that Defendants received a warning that Google's

17 practice of accepting these advertisements was illegal.

18     For example, on July 7, 2008, Joseph A. Caliano, Jr., the head of the National Center on

19 Addiction and Substance Abuse at Columbia University (CASA) warned Google, and in

20 particular, Defendant Schmidt, that CASA "was able to find prominent displays for ads for rogue

21 Internet pharmacies in a Google search for controlled drugs . . . [which] suggests that Google is

22 profiting from advertisements for illegal sales of controlled prescription drugs online." ¶40.

23 Similarly, on December 23, 2008, the NABP warned Google and defendant Schmidt that Google

24 "sponsored search results (online advertising) for Internet drug outlets that appear to be operating

25 in violation of the law and/or accepted standards of pharmacy practice in the United States."

26 ¶41.

27     For purposes of establishing standing through contemporaneous stock ownership, each

28 and every time that Defendants consciously decided to ignore a warning and not to take any

action to block the illegal advertisements constitutes a separate transaction. *See Desimone*, 924 A.2d at 913 (illegal backdated stock option grants were "discrete" transactions that were "completed the moment the grants were issued"). Accordingly, Defendants' decisions not to take any action permitted Google to commit numerous illegal acts and transactions from the date of Plaintiff Orlando Police's purchase in May 2005 through 2009, each of which contributed to the $500 million forfeiture. Indeed, Plaintiff owned its shares of Google stock at the time of each of the following examples of a challenged transaction or conduct:

(1)   on August 23, 2005, when an email from an employee in Google's policy group affirmed that the Company permitted Canadian pharmacies "to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting" (¶47);

(2)   on February 13, 2008, when an email from a member of Google's policy group confirmed that "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady fraudulent advertisers know not to do this" (¶50);

(3)   from 2006 through 2009, when Google ran illegal Canadian ads while retaining PharmacyChecker, a third-party verification company that improperly and purposefully designed its protocols to certify and allow Canadian pharmacies to use the AdWords system (¶36);

(4)   after July 2008, when Google knowingly permitted Canadian advertisers to use the Company's AdWords system, even though Defendants were already warned by the NABP that PharmacyChecker certified pharmacies that sourced prescriptions from outside the United States (¶41);

(5)   after December 2008, when Goggle ran illegal Canadian ads even though Defendants were warned by CASA that PharmacyChecker was not screening out all illegal pharmacy ads (¶40); and

1     (6) in 2005 and 2006, when Google ran illegal Canadian pharmacy ads while

2     retaining Square Trade, a third-party verification company that also verified

3     Canadian pharmacies, by design (¶36).

4   Despite this well-settled law about separate transactions and conduct, Defendants

5 incorrectly contend that Plaintiff does not have standing because Plaintiff did not own Google

6 stock at the time of the first wrongful transaction involving related conduct.  Mot. at 8 (claiming

7 lack of standing when "the challenged conduct allegedly *commenced*" (emphasis added)).

8 Defendants' argument relies on the contention that its series of wrongful transactions

9 commenced prior to Google's public offering, such that Google could continue the conduct in

10 perpetuity without fear of a shareholder suit.  *Id.*  The Rule 23.1 continuous ownership

11 requirement was not designed to work in this manner, such that it would provide a bar to

12 meritorious claims.  Indeed, Delaware courts have consistently construed stock ownership

13 requirements *liberally*, so as not "to unduly encourage the camouflaging of transactions and thus

14 prevent reasonable opportunities to rectify corporate aberrations."  *Maclary v. Pleasant Hill,*

15 *Inc.*, 109 A.2d 830, 833 (Del. Ch. 1954).

16   Defendants' reliance on *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 299 (2d Cir.

17 2003) is misplaced, and does not defuse this basic tenet.  In *Bank of New York*, the court

18 dismissed the alleged derivative claims based on a lack of standing where the plaintiff failed to

19 own stock until "well after all or most of the alleged wrongdoing had occurred."  *Id*.  Here, that

20 is clearly not the issue, as Plaintiff has owned Google stock continuously since May 2, 2005, and

21 the challenged transactions occur throughout 2006, 2007, 2008 and 2009.[3]

22   To the extent that the Complaint details Defendants' actions or any transactions or

23 conduct that occurred prior to May 2, 2005, it is for the proper purpose of providing context, and

24 not to bring derivative claims for the actions that occurred prior to Plaintiff's acquisition of

---

25 [3] Likewise, Defendants' reliance on *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp.

26 2d 919, 926 (N.D. Cal. 2010) is also inapposite.  *First*, plaintiffs in *Accuray* did not allege the date when they purchased the stock, as Plaintiff Orlando Police has.  *Id.  Second*, the allegations

27 in *Accuray* were that defendants made material misrepresentations in the company's SEC filings that were filed before plaintiffs purchased the stock, and plaintiffs did not and could not argue

28 that the post-purchase misrepresentations were separate transactions.  *Id.* at 923-24.

Google stock.  These facts, as alleged, indicate that defendants knew that Google's practice of accepting Canadian pharmacy ads was illegal.  It is well-settled that Plaintiff is entitled to rely on allegations that occurred prior to their stock purchases to demonstrate defendants' pattern and practice of permitting Google to accept illegal advertisements.[4]  Indeed, the facts alleged provide context for the $500 million forfeiture, and indicate where the NPA specifically cited improper conduct that occurred from 2005 to 2009.  ¶¶47, 50, 57.

Accordingly, Plaintiff Orlando Police has adequately alleged its contemporaneous and continuous stock ownership pursuant to Rule 23.1 to establish its standing to bring this derivative action for the transactions alleged.

## II. Plaintiff Has Properly Alleged That Defendants Wrongfully Refused Its Demand

### A. Rule 23.1 Requires Plaintiff To Allege Particularized Facts, But Not Evidence, Supporting A Reasonable Doubt Of Wrongful Refusal Of The Demand

Rule 23.1, which governs shareholder derivative actions, provides that a plaintiff must "state with particularity . . . the reasons" why the demand was wrongfully refused.  Fed. R. Civ. P. 23.1(b)(3).  Rule 23.1 requires that, under Delaware law, the plaintiff plead particularized facts to support the wrongful refusal allegations, but "the plaintiff is *not* required to plead evidence." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (emphasis added); *see Zimmerman v. Braddock*, C.A. No. 18473-VCN, 2005 Del. Ch. LEXIS 135, at *31 (Del. Ch. Mar. 3, 2010), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006) ("the Court must be careful not to put too high

---

[4] *See In re MRV Communs., Inc.*, 2010 U.S. Dist. LEXIS 46946, at *6 (C.D. Cal. May 10, 2010) ("Allegations of pre-standing conduct are permissible to demonstrate defendants' pattern of conduct to support claims based on conduct occurring during the ownership period."); *Zoran*, 511 F. Supp. 2d at 1010 ("Even though plaintiff does not have standing to seek recovery for the corporation for transactions that occurred before August 11, 2003, he may still refer to grants before that date to establish that [] management had a predisposition to engage in backdating."); *see also In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (holding that evidence of time-barred claims are admissible to establish a scheme and scienter).

a burden on pleaders . . . .").[5]  In ruling on a motion to dismiss, the Court must accept as true all of the Complaint's allegations and the reasonable inferences that logically flow from them. *Brehm*, 746 A.2d at 255; *Zimmerman*, 2005 Del. Ch. LEXIS 135, at *24.

Under Delaware law, the "business judgment rule" is a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [*i.e.*, with due care], in good faith and in the honest belief that the action taken was in the best interest of the company."  *Cede & Co. v. Technicolor*, 634 A.2d 345, 360 (Del. 1993) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  The Company's refusal of Plaintiff's Demand may not be protected by the business judgment rule, if Plaintiff can allege "a ***reason to doubt that the board acted independently or with due care*** in responding to the demand."  *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) (emphasis added).  The Delaware Supreme Court explained in *Grimes* that "the concept of ***reasonable doubt*** is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule."  *Id.* at 1217 n.17.  Thus, allegations that the Board "was biased, lacked independence, or failed to conduct a reasonable investigation" can demonstrate "a ***reasonable doubt*** that demand was properly refused."  *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 75 (Del. 1997), *overruled on other grounds, Brehm,* 746 A.2d 244 (emphasis added).

###    B.    Plaintiff Has Properly Alleged Particularized Facts Demonstrating A Reasonable Belief That Demand Has Been Wrongfully Refused

####         1.    Plaintiff Does Not Concede That the Board Acted Independently In Considering Plaintiff's Demand

Plaintiff has alleged with particularity facts raising a reasonable doubt with respect the independence of a majority of the Board.  *See* ¶¶66(A)(I)-(V).  Defendants do not, nor could they

---

[5] In evaluating whether demand is properly excused, federal courts under controlling choice of law principles look to the substantive law of the state of incorporation, in this case Delaware, to determine whether improper demand refusal has been properly alleged.  *Kamen v. Kemper Fin'l Servs.*, 500 U.S. 90, 108 (1991); s*ee also* Defendants' Mot. at 10 (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999)).

reasonably, dispute that these particularized facts are sufficient to demonstrate that a majority of the Board is, in fact, not independent.  Instead, Defendants assert that by making a demand, Plaintiff has forever, as a matter of law, conceded the issue of independence.  Defendants are in error.

While a shareholder may concede the facial independence of the board at the time the Demand is made, "[i]t is not correct that a demand concedes independence 'conclusively' and *in futuro* for all purposes relevant to the demand."  *Scattered Corp.*, 701 A.2d at 74-75.  To the contrary, if a demand is made, the shareholder has conceded on the right to claim that demand is excused, not the right to assert that the Board failed to act independently, disinterestedly and with due care in carrying out its fiduciary duties in response to the demand.  *Id*.  The Delaware Supreme Court has thus rejected a prior line of Delaware authority holding that a making of a demand conclusively conceded demand futility.  *See, e.g., Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10-11 (Del. Ch. 1991) (citing *Levine v Smith*, 591 A.2d 194, 212 (Del. 1991) and *Spiegel v. Buntrock*, 571 A.2d 767, 773-76 (Del. 1990)).

The rule requiring that independence be conceded upon the making of a demand was attacked as inconsistent with the goal of a shareholder demand promoting intra-corporate resolution of disputes short of actual litigation.  *See*, *e.g.*, John C. Coffee, *New Myths and Old Realities: The American Law Institute Faces the Derivative Action*. 48 Bus. Law. 1407 (1993) (discussing alternative approach adopted by the American Law Institute model rules of corporate governance); *Kamen v. Kemper Financial Services, Inc.*, 908 F.2d 1338, 1343-45 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991).  As a result, other state courts interpreting Delaware law on the similar issue of how to address demand futility expressly declined to adopt a rule that the making of a demand concedes directorial independence in evaluating the response to any such demand.  *See, e.g.*, *In re PSE&G Shareholder Litig*., 173 N.J. 258, 290-91 (N.J. 2002).

Instead, as subsequently explained by the Delaware Supreme Court in *Grimes*, the shareholder making a demand "has spent one – but only one – 'arrow' in the 'quiver' . . . [t]he spent 'arrow' is the right to claim that demand is excused."  *Grimes,* 673 A.2d at 1218-19.  The

Delaware Supreme Court explains further, that "[s]imply because the composition of the board provides no basis *ex ante* for the stockholder to claim . . . that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact acted independently, disinterestedly or with due care in response to the demand." *Id.* at 1219.

Thus, the "[f]ailure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation," and such a "failure could constitute wrongful refusal." *Scattered Corp,* 701 A.2d at 75; *see also Copeland v. Lane*, 2013 U.S. Dist. LEXIS 65742, at *26 (N.D. Cal. May 6, 2013) (holding that because "the Delaware Supreme Court had held that a demand does not necessarily concede independence 'conclusively and *in futuro* for all purposes relevant to the demand' . . . a plaintiff could still demonstrate wrongful refusal based on post-demand conduct of the Board." (citing *Scattered Corp.*)).[6]

In *Behradrezaee v. Dashtara*, 910 A.2d 349, 363-64 (D.C. 2006), the District of Columbia Court of Appeals, following Delaware law, decided that a plaintiff had properly alleged a lack of independence in the board's review of a shareholder demand.  In that decision, the D.C. Court cogently explained the reasons why Delaware law does *not* concede independence of the Board by making a demand, as follows:

> It is eminently logical and reasonable to permit *ex post* challenges to the board's independence. Allegations that the board "was biased, lacked independence, or failed to conduct a reasonable investigation, . . .[can] create [ ] a reasonable doubt that demand was properly refused." *Scattered Corp., supra*, 701 A.2d at 75. Adoption of this approach is consistent with a principal purpose of the demand rule, which is to give the directors of the corporation, who are responsible for corporate governance including litigation decisions, the opportunity to redress the wrong before a shareholder resorts to litigation.  It is also consistent with the goal

---

[6] Defendants' reliance on *Copeland v. Lane*, 2012 WL 4845636, 2012 U.S. Dist. LEXIS 146815, at *14-15 (N.D. Cal. Oct. 10, 2012), to support dismissal is misplaced.  Unlike here in Plaintiff's Complaint, as explained further below, the plaintiffs in *Copeland* only alleged facts regarding the directors' "interest and independence with respect to the conduct underlying the [d]emands" and "did not assert[] facts challenging the Board's independence based on events *after* receiving the [d]emands." *Id.*  Furthermore, unlike the plaintiffs in *Copeland*, Plaintiff here alleges facts that the Special Committee members Mather and Greene "were beholden to an interested person or otherwise conflicted by self-interest." *Id.*, at *19.

of promoting judicial economy, since the board may take corrective action that obviates the need for litigation. However, a rule that a demand concedes for all purposes any claim of bias or lack of independence in the board's action thereafter might discourage presuit demands and work against the goal of promoting judicial economy. Given the logic and benefits of Delaware's approach on this issue as enunciated in *Scattered Corp., supra*, and *Grimes, supra*, we are persuaded to follow that approach. Therefore, we conclude that appellant-shareholder did not lose his right to allege directors' bias and lack of independence in its action on his demand simply by filing a presuit demand. He retains the right to show, if he can, that the board's bias, lack of independence or failure to conduct a reasonable investigation creates a reasonable doubt that the demand was properly refused. *See Scattered Corp.*, 701 A.2d at 75.

*Behradrezaee*, 910 A.2d at 360-61.

Among the facts which could provide a basis for challenging the independence of a Board following the making of a demand include, "an allegation that a special committee of independent directors had been authorized only to investigate and recommend to the full (conflicted) board not to act in the matter." *Thorpe*, 611 A.2d at 11 n.5. The theory of such a claim is that "while the board may have been able to act independently through a fully empowered special committee of independent directors (thus justifying a shareholder in making a demand), the board chose not to do so, thus justifying treating the board as not independent." *Id*.

Here, similar facts are present.   Three-months <u>*after*</u> Plaintiff's Demand, with no explanation offered for this incredible lapse in time before taking any action, the defendant-dominated Board appointed the Special Committee consisting of director Diane B. Greene and defendant Ann Mather to investigate the matter, but the Board retained ultimate authority over any decisions to be made with respect to those claims.   ¶64; DRL at 2.   These *in futuro* facts which could not have been known *ex ante* by Plaintiff before making its Demand allow Plaintiff to assert the lack of independence on the part of a majority of Google's Board in responding to the Demand.

The other basis for challenging the independence of a majority of the Board, even after having made a demand, are "later uncovered facts showing a self-interest of the board . . . ." *Thorpe*, 611 A.2d at 11.  Here, Plaintiff sufficiently alleges facts "uncovered" after Demand was

1   made that raise a "reasonable doubt" as to whether the Special Committee could act with

2   integrity and objectivity.  Indeed, the Board decided to install a conflicted and non-independent

3   Special Committee in response to the Demand.  When the Board formed the Special Committee,

4   it was fully aware of the charges that the Committee would be investigating.  The Board was

5   therefore required to form "a perfectly independent special litigation committee."  *Booth Family*

6   *Trust v. Jeffries*, 640 F.3d 134, 143 (6th Cir. 2011) (applying Delaware law).  In this regard, the

7   composition and conduct of the Special Committee was required to be "such as to instill

8   confidence in the judiciary and, as important, the stockholders of the company that the

9   committee can act with integrity and objectivity."  *Id.* at 146-47 (citation omitted).

10      Here, the defendant-dominated Board appointed a Special Committee with only two

11   members, defendant Mather and non-defendant Greene.  As alleged in the Complaint, defendant

12   Mather served as a director of Google since November 2005, during the time of the underlying

13   wrongdoing (*see, e.g.*, ¶19); and was personally liable for breaching her fiduciary duties, as

14   alleged.  Thus, the Board's decision to include defendant Mather in the Special Committee and

15   her recommendation to reject Plaintiff's demand raises doubts as to the integrity and impartiality

16   of the Board's refusal.  *See Stepak v. Addison*, 20 F.3d 398, 405 (11th Cir. 1994) ("We take it as

17   axiomatic that a board would not be acting consistently with its fiduciary duties were it to reject

18   a shareholder demand based on an investigation and presentation by the alleged wrongdoers.")

19   (*citing Smith v. Van Gorkom*, 488 A.2d 858, 874 (Del. 1985)); *see also Booth*, 640 F.3d at 147

20   (although including a defendant on a special committee is not necessarily dispositive for

21   determining the committee's independence, doing so clearly "adds doubt.").[7]

22      The Board's refusal in response to the Demand became further conflicted by appointing

23   director Greene to the Special Committee.  Indeed, "a [Special Committee or "SLC"] member is

24   not independent if he or she is incapable, for any substantial reason, of making a decision with

---

25   ─────────────

26   [7] S*ee also Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) ("[a] 'substantial

27   likelihood' of personal liability prevents a director from impartially considering a demand");
    *Behradrezaee*, 910 A.2d at 360-361 (relying on Delaware law including *Scattered Corp*., 701
    A.2d at 75, in finding demand was wrongfully refused where board members, who were
    involved in the underlying transactions, did not act in an independent and disinterested manner in
    refusing the demand).

only the best interests of the corporation in mind." *London v. Tyrrell*, 2010 Del. Ch. LEXIS 54, at *39 (Del. Ch. Mar. 11, 2010) (citing *In re Oracle Derivative Litig*., 824 A.2d 917, 920 (Del. Ch. 2003)).  By rule of law, "[i]ndependence can be impaired by lesser affiliations, so long as those affiliations are substantial enough to present a material question of fact as to whether the SLC member can make a totally unbiased decision.  For example, independence could be impaired if the SLC member senses that he owes something to the interested director based on prior events." *Id.*

Here, the Complaint alleges that Greene's independence was impaired because she was granted $1 million in Google Stock Units (which entitle the holder to Class A common stock) on February 1, 2012, two months before the formation of the Special Committee on April 11, 2012.  Greene's stock unit award vests over the course of four years, but only if Greene remains as a member of the Board during that time.   ¶66(A)(V).  Because the same senior executive defendants at issue in the investigation control Google and have the ability to remove Greene from the Board at their discretion, Greene had a significant financial incentive to recommend that litigation no be brought in response to Plaintiff's Demand.  Accordingly, Greene, who only became a director following the shareholder demands, was unable to serve as an independent member of the Special Committee; and as a Board member was unable to independently consider the Demand.

Therefore, Plaintiff has adequately alleged wrongful demand refusal based upon the lack of independence of a majority of Google's Board.[8]

### 2.   Plaintiff Has Alleged Particularized Facts Demonstrating That The Board Failed To Act With Good Faith In Considering The Demand

Contrary to Defendants' assertions, the Board did not act reasonably or in good faith in the manner in which it responded to Plaintiff's Demand.  Plaintiff raises a reasonable doubt as to

---

[8]  In making this argument, Plaintiff recognizes that certain courts continue, we believe incorrectly, to read Delaware case law to preclude a challenge to director independence on a demand refusal motion.  However, even those cases concede that "self-interest may be considered with regard to the managers' behavior, ex post, in response to the demand, as indicative of their good faith and reasonableness."  *Scott v. Lackey*, 2012 NCBC 58, at *53 (N.C. Super. Ct. 2012) (applying Delaware law and finding that demand was improperly refused).

the Board's good faith by alleging facts that it ignored admitted violations of the law, evidenced by Google entering in the NPA with the DOJ and the admissions within the NPA.  ¶¶57; 66(D). By ignoring the facts leading to the NPA, the Special Committee "prejudged the merits of the suit … and then conducted the investigation with the object of putting together a report that demonstrated the suit has no merit."  *London*, 2010 Del. Ch. LEXIS 54, at *51; *see also Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795, 799 (E.D. Va. 1982) (noting the "relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation.").

The Demand Refusal Letter's conclusion that the Special Committee "found no wrongdoing or culpability by Google's directors or officers in connection with Google's acceptance of Canadian online pharmacy advertising" is directly contrary to the statement by U.S. Attorney Peter Neronha (¶46) and from Congressional testimony (¶¶38-39 and 42-43) reflecting the conscious disregard of known facts and direct participation of Google executives in facilitating the illegal sale of Canadian pharmaceutical products in the United States.  In particular, the U.S. Attorney's investigation included a review of "more than four million documents" which supported U.S. Attorney Neronha's statement following the $500 million settlement that "[w]e simply know it from the documents we reviewed, witnesses that we interviewed, that Larry Page knew what was going on."  ¶46.  Moreover, under the terms of an NPA signed by Google and the Government, "Google acknowledge[d] that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the Company accept[ed] responsibility for this conduct."  ¶57.

That the Special Committee and the Board refused Plaintiff's Demand to take further action in the face of such evidence of wrongdoing and record-setting $500 million forfeiture raises more than a reasonable doubt that the Board acted in bad faith and was unreasonable in its refusal.  In fact, Defendant's rejection of Plaintiff's Demand in the face of clear and admitted wrongdoing constitutes a breach of their duty of good faith.  *See In re SFBC Int'l Inc. Sec. & Deriv. Litig.*, 495 F. Supp. 2d 477, 486 (D.N.J. 2007) ("directors have exposed themselves to personal liability by allegedly ignoring particularly flagrant and reprehensible wrongdoing")

(citations omitted); *In re Tower Air, Inc.*, 416 F.3d 229, 239 (3d Cir. 2005) ("The officers' alleged passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgment that its only explanation is bad faith") (citations omitted).

Indeed, the requirement that directors pay attention and correct obvious wrongdoing is not novel. The Delaware Supreme Court explained in *Graham v. Allis-Chalmers Mfg. Co.* – a seminal case for establishing the standards of director liability – that if a director "has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him." 188 A.2d 125, 140 (Del. 1963). That is exactly what is alleged here.

### Refusing to make the Report public also raises reasonable doubts.

In addition, and contrary to Defendants' contention otherwise, the Special Committee's failure to make the Special Committee Report public is itself, standing alone, sufficient to demonstrate that the underlying investigation reflected in the Special Committee Report was not the product of good faith and due care, and did not reach a reasonable result. ¶66(N). While relying on the Special Committee's 149-page Report to justify the Demand Refusal, Defendants have put the Report at issue. Yet, by refusing to make the Report public, Defendants have "effectively insulate[ed] its investigation from scrutiny by a Court or otherwise," thus raising doubt as to the integrity of the Board's decision. *In re Par Pharmaceutical, Inc. Derivative Litig.,* 750 F. Supp. 641, 647-648 (S.D.N.Y. 1990).[9]

Indeed, courts have routinely looked disfavorably upon a board's refusal to make a special committee report public. For example, in *Joy v. North*, 692 F.2d 880 (2d Cir. 1982), *cert. denied sub nom.*, 460 U.S. 1051 (1983), the Second Circuit reversed an order placing the report of the special committee recommending termination of the derivative suit under seal. The Second Circuit explained: "We simply do not understand the argument that derivative actions

---

[9] Defendants assert that there is "no requirement that a board keep a plaintiff [or the public at large] informed *throughout* the investigation." Mot. at 16 (quoting *Copeland*, 2012 WL 4845636, at *6) (emphasis added). This point is meaningless here, where the investigation has been *concluded* (*i.e.*, is not on-going), and where the Company is relying on a Report of the Special Committee to refuse Plaintiff's Demand.

may be routinely dismissed on the basis of secret documents.  We cannot say what the effect on investor confidence would be if special litigation committees were routinely allowed to do their work in the dark of night."  *Id*. at 893.  The court further held that if a special committee recommends termination, the committee must fully disclose its report and the underlying data in seeking dismissal.  *Id*.  For these same reasons, the Board's refusal to make the Report public raises a reasonable doubt as to the Board's good faith in considering and rejecting Plaintiff's Demands.

### The Special Committee's lack of authority raises reasonable doubts.

Furthermore, reasonable doubt exists as to the Board's good faith in rejecting Plaintiff's Demand because the Special Committee was not given the authority to commence legal action and could only give "recommendations" that could simply be overruled by the Board.  ¶64.  The Board's decision to create a committee without real authority compromised the integrity and objectivity of the process.  As explained in *Biondi v. Scrushy*, "if the committee is not fully empowered to act for the company without approval by the full board, or if the committee behaves in a manner inconsistent with the duty to carefully and open-mindedly investigate the alleged wrongdoing, its ability to instill confidence is, at best, compromised and, at worst, inutile."  820 A.2d 1148, 1156 (Del. Ch. 2003); s*ee also Par*, 750 F. Supp. at 647 ("a mere advisory role of the Special Litigation Committee fails to bestow sufficient legitimacy on the Board's decision to warrant deference to the Board.").

Here, the actual authority of the Special Committee was even more essential to a showing of good faith because the Defendants formed an overwhelming majority of the Board.  The Special Committee had no incentive to recommend an action if it knew its recommendation would be rejected by the Board.  Moreover, when the Board, dominated by Defendants, decided to adopt the Special Committee's recommendation to refuse demand to take any action, it was not acting independently in considering Plaintiff's Demand.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Plaintiff Has Alleged Particularized Facts Demonstrating That The Board Failed To Act In An Informed Manner And With Due Care

Contrary to Defendants' assertions, the Complaint also raises a reasonable doubt that the Board acted in an informed manner and with due care in considering and refusing Plaintiff's Demand, and thus, the Board did not reach a reasonable result.  Indeed, a special committee "fails to conduct a reasonable investigation if it simply accepts defendants' version of disputed facts without consulting independent sources to verify defendants' assertions." *London*, 2010 Del. Ch. LEXIS 54, at *55.

In particular, the Special Committee improperly limited its investigation to sources supporting a conclusion that Defendants did not breach their fiduciary duties.  The Complaint alleges that the Special Committee's investigation was not reasonable as the Board failed to interview, *inter alia*, U.S. Attorney Neronha, and the third-party verification companies Square Trade and PharmacyChecker that were directly involved in the illegal advertising.  ¶66.[10]

Given that the Board's conclusions in the Demand Refusal Letter differed significantly from U.S. Attorney's statements, the Board was unreasonable in not explaining why the statement of Peter Neronha was incorrect and why he does not appear among the list of persons interviewed by the Special Committee.  The Special Committee also failed to interview material witnesses such as Andrew McLaughlin, Google's senior policy counsel, who testified before Congress in 2004, and stated, among other things, that "[i]t is evident to us as much as anybody that there is a serious problem with illegal sales of online drugs over the Internet."  ¶39.

Without these interviews, the Board's investigation was unreasonable, and only reflected one side of the story – the side that no wrongdoing occurred, despite the admissions in the NPA. Unlike in *Copeland*, and contrary to Defendant's contentions (*see* Mot. at 15), the Complaint identifies specific individuals and companies "who should have been interviewed but were not, how those unidentified individuals had knowledge that was unique and unobtainable without

---

[10] Defendants assert that the Special Committee did interview a representative at LegitScript, an independent verification service.  Mot. at.15 n.23.  However, LegitScript was not retained until 2010, and only in the wake of the government's investigation.  ¶56.

those interviews, and how those interviews, if taken, would have altered the Board's decision to refuse demand." Mot. at 15 (quoting *Copeland*, 2012 WL 4845636, at *8).

In the face of these allegations, Defendants now assert that that Board did not *have* to interview anyone, and baldly asserts that its investigation was sufficient on that basis. Mot. at 15 (quoting *Quantum Tech. Partners II, L.P. v. Altman Browning & Co.,* 2009 WL 1795574, at *12 (D. Or. June 24, 2009)). In addition, Defendants tout the fact that the Special Committee conducted "fourteen interviews of current and former employees" as a basis for the 149-page Report and as evidence that the Board's refusal was reasonable. Yet, as explained above, Defendants refuse to make public the Report, which raises a reasonable doubt as to the Board's good faith and due care. Moreover, 14 interviews purportedly having been conducted and the page-length of the Report are superficial metrics which do not speak to the quality of the investigation. *See, e.g., Oracle Corp.,* 824 A.2d at 921, 925 (refusing to give deference to a special committee report that was over 1,100 pages long and involved the interviews of over 70 witnesses).

In sum, and as alleged in the Complaint, the Special Committee purposefully avoided sources that would show misconduct, thereby giving rise "to a material question about the reasonableness and good faith of the SLC's investigation." *London*, 2010 Del. Ch. LEXIS 54, at *55 (citing *Sutherland v. Sutherland*, 958 A.2d 235, 242 (Del. Ch. 2008) (holding that there was a material doubt as to the reasonableness and good faith of a special litigation committee's investigation where the special litigation committee's report did not include an analysis of two large payments the corporation had made on the defendants' behalf, even though the complaint alleged that defendants had used corporate funds for personal benefit)).

In addition to the allegations set forth above, the Complaint also alleges that the Special Committee's Report and Board's considerations in refusing the Demand were not reasonable, and the Demand Refusal Letter was deficient in the following regards:

- The DRL references legal advice purportedly sought in connection with the wrongful conduct, but does not explain from whom that advice was sought or what advice was given. ¶66(F).

- The DRL fails to explain why the online pharmacy issue failed to reach the Board level until after Google learned of the government investigation, or how the failure to reach the Board level until that time was consistent with the Board's responsibility to oversee the Company's operations.  ¶66(G).

- The Report failed to consider whether insurance coverage would be available to compensate the Company in the event a Google shareholder, *i.e.*, Plaintiff, rather than the Company itself, brought the underlying action.  ¶66(I).

- The DRL failed to quantify the amount of time and resources necessary to bring the claims which are the subject of the Demand.  ¶66(J).

- The DRL speculatively claims that litigation would harm Google employee morale while failing to take into account the benefits of the likely reforms and cash recovery that would benefit the Company through the prosecution of derivative claims. ¶66(K).

In sum, the Complaint raises reasonable doubts as to the Board's reasonableness and due care in considering and refusing Plaintiff's Demands.  Accordingly, if there is reason to doubt that the Board acted independently or with due care in responding to Plaintiff's demand, the Board's failure to act as such constitutes wrongful refusal and Plaintiff may proceed with its derivative action.  *Grimes*, 673 A.2d at 1219; *Scattered*, 701 A.2d at 75.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendants' Motion should be denied in its entirety.  If the Court finds any deficiencies in the Complaint, Plaintiff respectfully requests the Court's guidance and leave to amend.  Fed. R. Civ. P. 15(a)(2) ("The Court should freely give leave [to amend] when justice so requires.").

Dated: June 21, 2013                                        Respectfully submitted,

                                                ABRAHAM, FRUCHTER &
                                                   TWERSKY, LLP


                                                  */s/ Ian D. Berg*
                                                   IAN D. BERG

IAN D. BERG
TAKEO A. KELLAR
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 792-3448
Fax:    (858) 792-3449
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

- AND -

JEFFREY S. ABRAHAM
ATARA HIRSCH
One Penn Plaza, Suite 2805
New York, NY 10119
Tel:    (212) 279-5050
Fax:    (212) 279-3655
*jabraham@aftlaw.com*
*ahirsch@aftlaw.com*

*Counsel for Plaintiff City of Orlando
Police Pension Funds*