UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY OF ORLANDO POLICE
PENSION FUND,

    Plaintiff,

v.

LAWRENCE E. PAGE, et al.,

    Defendants.

_____/

No. C 13-2038 PJH

**ORDER DENYING MOTION TO DISMISS**

Defendants' motion to dismiss plaintiff's verified consolidated shareholder derivative complaint came on for hearing before this court on July 24, 2013. Plaintiff City of Orlando Police Pension Fund ("plaintiff") appeared through its counsel, Ian Berg. Individual defendants and nominal party Google, Inc. (collectively "defendants") appeared through their counsel, Boris Feldman and Elizabeth Peterson. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES defendants' motion as follows.

## BACKGROUND

This is a shareholder derivative action on behalf of nominal defendant Google, Inc. ("Google"), against nine members of Google's Board of Directors.[1] Plaintiff alleges that defendants allowed certain Canadian pharmacies to advertise via Google's search engine for the sale of prescription medications to be imported into the United States, which advertisements were unlawful, and which resulted in the entry of a non-prosecution

---

[1] The specific named individual defendants who form a part of Google's Board of Directors are: Larry Page ("Page"); Sergey Brin ("Brin"); Eric E. Schmidt ("Schmidt"); L. John Doerr ("Doerr"); John L. Hennessy ("Hennessy"); Ann Mather ("Mather"); Paul S. Otellini ("Otellini"); K. Ram Shriram ("Shriram"); and Shirley M. Tilghman ("Tilghman") (all collectively "defendants").

agreement ("NPA") between Google and the United States Department of Justice ("DOJ"), and the payment by Google of a $500 million fine. See generally Verified Consolidated Shareholder Derivative Complaint ("Complaint").

Plaintiff alleges that Google, who operates the world's most popular Internet search service, earns revenue primarily through paid advertising. See Complaint, ¶ 1. Plaintiff further alleges that defendants allowed Google to facilitate the placing of advertisements by online Canadian pharmaceutical companies soliciting the sale of prescription drugs in the United States, in violation of the Food, Drug, and Cosmetic Act and the Controlled Substances Act. Id., ¶¶ 2, 3.

Plaintiff alleges that defendants were warned that the shipment of drugs into the U.S. by Canadian pharmacies violated federal law. For example, on March 13, 2003, the National Association of Boards of Pharmacy ("NABP") warned Google that "the importation of prescription drugs from foreign countries generally violates" federal law. Complaint, ¶ 30. While Google did eventually retain two companies (Square Trade and PharmacyChecker) to verify online pharmacies, plaintiff alleges that Google "knowingly permitted Square Trade to verify Canadian online pharmacies that merely self-certified that they were in compliance with applicable U.S. regulations," and "also knowingly permitted PharmacyChecker to certify Canadian online pharmacies that sold prescription drugs." Id., ¶ 36. The NABP sent a second warning letter to Google on December 23, 2008, writing that "a third-party verification service that Google uses to screen prescription drug Web sites has certified several pharmacy Web sites that source their prescription drugs from various locations outside of the United States (Canada and elsewhere), which is contrary to US law." Id., ¶ 41. Google also received a warning from The National Center on Addiction and Substance Abuse ("CASA") on July 7, 2008, stating that it "was able to find prominent displays of ads for rogue Internet pharmacies in a Google search for controlled drugs," which suggested that "Google is profiting from advertisements for illegal sales of controlled prescription drugs online." Id., ¶ 40.

Plaintiff further alleges that Google's employees were aware that Canadian online pharmacies were circumventing the Square Trade and PharmacyChecker certification process, and points to a February 13, 2008 email from a member of Google's policy group stating that "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady fraudulent advertisers know not to do this." Complaint, ¶ 50.

Plaintiff alleges that Google did nothing to block Canadian pharmacy ads until 2009, when it became aware of the DOJ investigation. Ultimately, Google entered into the NPA, which admitted wrongdoing and stated that Google "was on notice that most Canadian online pharmacy advertisers . . . geo-targeted their advertisements to consumers in the United States and imported into the United States both controlled prescription drugs, in violation of [the Controlled Substances Act], and misbranded and unapproved prescription drugs, in violation of [the Food, Drug, and Cosmetic Act]." Complaint, ¶ 54. Google further admitted that "it improperly assisted Canadian online pharmacy advertisers to run these advertisements that geo-targeted the United States" and stated that it "accepts responsibility for the Company's conduct." Id. As stated above, the NPA provided for Google to forfeit $500 million to the U.S. government. Id., ¶ 54.

Plaintiff alleges that defendants owed Google and its shareholders (of which plaintiff is one) the fiduciary duties of loyalty (including duties of candor and good faith) and care. Complaint, ¶ 70. As part of those duties, defendants were required to ensure that Google complied with all federal laws relating to the importation of drugs into the U.S. and were required to maintain controls and policies to ensure that Google complied with those laws. Id. Plaintiff alleges that defendants breached their fiduciary duty of care in failing to perform their oversight duties as directors of the company, in failing to ensure the company's compliance with federal law, and in failing to ensure that a reasonable reporting system existed to elevate material issues to the board. Id., ¶ 72. Plaintiff further alleges that the "senior executive defendants" (i.e., Page, Brin, and Schmidt) breached their duty of loyalty by consciously failing to stop the company from engaging in the unlawful conduct described in the complaint and by affirmatively permitting Canadian online pharmacies to

3

advertise via Google's search engine. Id., ¶ 71. As a result of these alleged breaches, plaintiff claims that Google has suffered significant harm and is entitled to damages. Id., ¶ 73.

Before filing suit, plaintiff made a demand on the board to take steps to investigate and hold the senior executives and directors responsible for Google's alleged violations of federal law. Complaint, ¶ 63. Specifically, plaintiff demanded that the board take appropriate action to obtain a recovery for the company and take additional steps to prevent the recurrence of similar wrongdoing in the future. Id. On April 11, 2012, the board created a committee, consisting of director Diane B. Greene ("Greene") and defendant Mather, to investigate plaintiff's demand. Id., ¶ 64. The committee ultimately refused the demand in a six-page letter to plaintiff (referred to as the "demand refusal letter" or "DRL"). The letter cited to the committee's full 149-page report, but did not include a copy of the report (which has not been made public). Id., ¶ 65.

Plaintiff alleges that the DRL did not provide a proper foundation for refusing the demand for at least the following reasons: (1) the decision to refuse the demand was made by the board, not by the committee, and the DRL failed to assess the independence of the board members, (2) the DRL failed to assess the independence of the committee, (3) the DRL hastily reached the conclusion that the committee's counsel (Seitz Ross) is independent, without fully assessing the possible grounds for non-independence, (4) the DRL's conclusion that the committee "found no wrongdoing or culpability" by Google's directors and officers is contrary to the statements of the Rhode Island U.S. Attorney, who investigated Google's conduct and found that Canadian pharmacies had been importing prescription drugs "with Google's knowledge and assistance," (5) the DRL's conclusion that Google's senior management "acted in good faith" is not supported by an explanation of the standard for "good faith," (6) the DRL refers to "legal advice" sought in connection with the wrongful conduct, but does not explain from whom that advice was sought or what advice was given, (7) the DRL does not explain why the online pharmacy issue did not reach the board level earlier, (8) the DRL ignored the importance of board proactivity in preventing

4

illegal conduct, (9) the report did not consider whether insurance would be available to compensate the company in case of a shareholder derivative suit, (10) the DRL did not quantify the time and resources necessary to bring the claims raised in the demand letter, (11) the DRL baselessly speculated that litigation would harm employee morale, (12) the DRL did not state whether the 12 employee interviews conducted by the committee were sufficient, (13) the DRL stated that no outside contractors or service providers were interviewed, and (14) the committee's failure to make its report public demonstrates that the report was not the product of good faith and due care and that it did not reach a reasonable result. Complaint, ¶ 66. Plaintiff further alleges that the board was unable to make an impartial decision regarding the demand, because a majority of its members face a substantial likelihood of liability and because they are not independent from the senior executive defendants (i.e., Schmidt, Page, and Brin). Id., ¶ 68.

Based on those allegations, plaintiff filed suit in this court on May 2, 2013, asserting one cause of action for breach of fiduciary duty. Although the claim is asserted against all defendants, plaintiff does differentiate between the defendants as a whole (who are alleged to have breached their fiduciary duty of care by failing to perform their oversight duties, failing to ensure the Company's compliance with the law, and failing to ensure that a reasonable information and reporting system existed in order to elevate material issues to the board), and the senior executive defendants (who are further alleged to have breached their duty of loyalty by consciously failing to stop the Company from engaging in the unlawful conduct and affirmatively permitting Canadian pharmacies to advertise in the U.S.). Complaint, ¶¶ 71-72.

Nominal defendant Google, together with the individual defendants, now seek an order dismissing the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1.

**DISCUSSION**

A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8.

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). All allegations of material fact are taken as true. Id. at 94. However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and quotations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level. Id.

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. See id. at 558-59. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). There are several exceptions to this rule. The court may consider a matter that is properly the subject of judicial notice, such as matters of public record. Id. at 689; see also Mack v. South Bay Beer Distributors, Inc., 798 F.2d

1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment). Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all parties as authentic. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

B.     Legal Analysis

As a threshold matter, defendants challenge plaintiff's standing under Rule 23.1, arguing that the complaint does not adequately allege that the plaintiff was a shareholder "at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b). Defendants note that plaintiff challenges conduct that allegedly began in 2003, even though Google did not become a publicly traded company until August 2004, and plaintiff did not purchase stock until May 2, 2005. Plaintiff concedes that it cannot challenge conduct that occurred prior to its stock purchase, but argues that "each and every time that defendants consciously decided to ignore a warning and not to take any action to block the illegal advertisements constitutes a separate transaction." Plaintiff argues that it is permitted to challenge transactions which occurred during its ownership period, even if those transactions are similar to other, pre-ownership transactions. In other words, that defendants ignored warnings before May 2, 2005 does not immunize them from liability for any ignored warnings that occurred after May 2, 2005.

The court agrees with plaintiff here, even though its reference to "transactions" is not directly applicable. Plaintiff does not complain about specific actions taken by defendants, and instead complains about defendants' inaction in response to specific warnings. And plaintiff does allege that at least two of those warnings (the 2008 NABP letter and the 2008 CASA letter) occurred during its stock ownership period. Complaint, ¶¶ 40, 41. Plaintiff also alleges that those two letters were sent to defendant Schmidt. Id. Thus, plaintiff does have standing to assert a claim that defendants breached their fiduciary duties by failing to

7

respond to those warnings. Plaintiff does not have standing to challenge defendants' lack of response to the 2003 NABP letter, though it may refer to that conduct to establish that defendants had a predisposition to ignore warnings regarding Canadian pharmacy ads. See, e.g., In re Zoran Corp. Derivative Litig., 511 F.Supp.2d 986, 1010 (N.D. Cal. 2007).

In addition to challenging standing, defendants argue that plaintiff has not adequately alleged that the refusal of its demand was wrongful. Because Google is a Delaware corporation, Delaware law governs the pleading requirements applicable to this derivative action. See, e.g., In re Silicon Graphics Sec. Litig., 183 F.3d 970, 989-90 (9th Cir. 1999). The Ninth Circuit has held that "Rule 23.1 and applicable Delaware law require a shareholder bringing a derivative lawsuit to plead with particularity that the shareholder made a pre-suit demand on the corporation and that the corporation wrongly refused to act." Lucas v. Lewis, 428 Fed. Appx. 694, 695-96 (9th Cir. 2011). The Delaware Supreme Court laid out the applicable test for determining whether a demand has been wrongfully refused in Scattered Corp. v. Chicago Stock Exchange, Inc., 701 A.2d 70, 73 (Del. 1997). The court noted that a board's refusal is evaluated under "traditional business judgment rule standards, which are the board's disinterest and independence and the good faith and reasonableness of its investigation." Id. However, by making a demand (rather than alleging demand futility), a shareholder concedes the disinterest and independence of the board. Id. Thus, the "only issues to be decided are the good faith and reasonableness of the board's investigation of the claims articulated in the demand." Id.

Despite the guidance provided by Scattered, the parties dispute whether plaintiff's demand actually served to concede the independence of the board. Defendants cite to a number of cases, including one from this district, holding that "it is settled law in Delaware that a shareholder who makes a demand concedes the disinterestedness and independence of a majority of the board to respond to the demand." See, e.g., Furman v. Walton, 2007 WL 1455904, at *4 (N.D. Cal. May 16, 2007). Plaintiff argues that the demand does not serve to concede all challenges to the directors' independence, but instead concedes "one – but only one – arrow in the quiver . . . the right to claim that

8

demand is excused." Grimes v. Donald, 673 A.2d 1207, 1218-19 (Del. 1996). The Scattered court addressed this apparent inconsistency, making clear that it "is not correct that a demand concedes independence 'conclusively' and in futuro for all purposes relevant to the demand." 701 A.2d at 74-75. The Scattered court noted that, even if a board appears to be independent ex ante, at the time that the demand is made, "it does not necessarily follow ex post that the board in fact acted independently, disinterestedly, or with due care in response to the demand." Id. at 74 (citing Grimes at 1219). In other words, a board "may appear to be independent, but may not always act independently." Id. The Scattered court reconciled this finding with the general principle that making a demand does concede independence by holding that "[f]ailure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation. Such failure could constitute wrongful refusal." Id. at 75. In other words, plaintiff did concede the independence (and disinterestedness) of the board by making its demand. But if plaintiff can show that the board did not act independently in responding to the demand, those facts will undermine any finding that the investigation was undertaken reasonably and in good faith. With those principles in mind, the Scattered court articulated plaintiff's burden as follows: "A plaintiff claiming wrongful refusal of a demand has the burden to plead particularized facts that create a reasonable doubt . . . whether the board conducted its investigation of the claims set forth in the demand reasonably and in good faith." Id. at 73.

In Scattered, the court ultimately held that plaintiff had not satisfied its burden to raise a reasonable doubt that demand was properly refused, and relied on the following facts: (1) the board created a special committee to investigate the demand, and plaintiff had not pled particularized allegations that the special committee was biased, lacked independence, or failed to conduct a reasonable investigation, (2) the special committee interviewed 25 people "as well as other people the plaintiffs had suggested would corroborate their claims of wrongful conduct," (3) the special committee found that the demand's claims were "unsubstantiated," and (4) a second committee (the "executive

9

committee") reviewed the special committee's findings and agreed that the demand should be refused. 701 A.2d at 76.

Defendants point to a number of similar facts present in this case. They argue that the board, in response to the demand, created an "independent committee" to investigate the demand. The independent committee interviewed 17 people, including "current and former inside counsel, as well as Google's outside counsel in the underlying DOJ investigation," and "the president of a third-party pharmacy monitoring service." After its investigation, the independent committee issued a 149-page report which, according to defendants, found "no wrongdoing or culpability by Google directors or officers in connection with Google's acceptance of Canadian online pharmacy advertising," and ultimately concluded that "pursuing the claims raised in the demands would not be in the best interests of Google and its shareholders." The independent committee's report was sent to the board of directors, which retained ultimate authority to accept or refuse the demand (though Page, Brin, and Schmidt were excluded from this decision). The remaining directors "voted unanimously to refuse the demand in its entirety." The independent committee's counsel then sent a letter to plaintiff (the demand refusal letter, or "DRL"), summarizing the board's reasons for refusing the demand. Defendants thus argue that plaintiff cannot raise a reasonable doubt that the board acted reasonably and in good faith in rejecting the demand.

Plaintiff makes a number of challenges to the process by which the demand was refused, but not all of them are consistent with the Delaware Supreme Court's guidance in <u>Scattered</u> and <u>Grimes</u>. For instance, plaintiff objects that "the board retained ultimate authority over any decisions to be made" with respect to the demand, which "could not have been known ex ante by plaintiff before making its demand." However, when plaintiff chose to submit its demand to the board, the only reasonable expectation was that the board itself would consider the demand. There was no promise of an independent committee, nor any requirement that the board establish such a committee. Plaintiff's reliance on cases involving Delaware's "special litigation committee" procedure is

10

misplaced, as those cases involve a specific Delaware procedure which was not invoked here, and which requires the committee to bear the burden of proving that there is no material issue of fact as to its independence. See, e.g., Booth Family Trust v. Jeffries, 640 F.3d 134, 142 (6th Cir. 2011). As explained above, in this case, plaintiff bears the burden of raising a reasonable doubt that the board investigated the demand reasonably and in good faith.

Putting aside plaintiff's allegations regarding the board's pre-demand disinterestedness and independence, the court does find that plaintiff has raised legitimate concerns regarding the board's investigation and ultimate refusal of the demand. First, plaintiff notes that defendants have not made the independent committee's report public, and argues that alone raises a reasonable doubt as to whether the refusal of plaintiff's demand was reasonable and in good faith. Defendants reply that "plaintiff never disputes that its counsel received a copy of the report," and note that the complaint "conspicuously does not assert any defects in the report itself." However, the court notes the defendants' carefully-worded response asserts that plaintiff's counsel has seen the report, but does not claim that anyone affiliated with plaintiff itself has seen the report, nor do defendants dispute the claim that the report has not been made public. And at the hearing, plaintiff's counsel specifically represented that the report remains confidential, and that he had seen the report only for limited purposes (presumably, during settlement discussions). Thus, defendants' argument that the complaint "conspicuously does not assert any defects in the report" appears to be disingenuous at best.

Defendants' failure to make the report public does not, by itself, make the refusal of the demand unreasonable. However, when combined with the conclusory nature of the demand refusal letter, the court finds that defendants have effectively insulated its investigation from any scrutiny, which is unreasonable. The DRL notes that the committee's investigation "included extensive document review and interviews of 17 individuals," and that the committee met six times before it "determined to recommend to the board that the demands be refused and that the company not bring any claims in

11

response to the demands because doing so would not be in the best interest of Google and its stockholders." Complaint, Ex. 1 at 3. The DRL then includes a two-page summary of the report itself, which stated that the committee "found no wrongdoing or culpability by Google directors or officers in connection with Google's acceptance of Canadian online pharmacy advertising, and no evidence that Google senior management had any conflict of interest or stood to benefit personally from Google's decisions regarding online pharmacy policy." Id. at 4. The committee further found that "Google senior management involved with Google's online pharmacy policy decisions acted in good faith and followed a robust process that included consultations with inside and outside counsel and elevation of key issues to the Executive Management Group level." Id. While the committee conceded that "there was at times a vigorous internal debate at Google regarding online pharmacy policy," it "concluded that this internal debate reflected good-faith differences of opinion among senior executives who were all acting in what they considered to be the best interests of the company." Id. The committee further found that none of the pharmacy policy decisions were the result of failure of controls or lack of oversight, and noted that Google took "extensive remedial action" after learning of the DOJ investigation. The committee then considered "(1) the likelihood that pursuing the litigation demanded would involve a substantial commitment of company time and resources; (2) the risk that litigation against the company's founders and current or former directors or officers could cause distraction or impair morale at a time when the company is enjoying economic success; and (3) the size of the $500 million forfeiture and the potential disruption from bringing suit viewed in the context of Google's scope as a business that generated revenues in excess of $37 billion in 2011." Id. at 5-6. The committee ultimately concluded that "pursuing the claims raised in the demands would not be in the best interests of Google and its stockholders," and that the company had already "appropriately responded to this experience, including through disciplinary actions against certain employees and significant enhancements to the company's online pharmacy policy and compliance programs." Id. at 6.

The court finds it especially notable that the DRL states that the committee "found

no wrongdoing or culpability by Google directors or officers," even though the NPA includes an "acceptance of responsibility," admitting that Google "improperly assisted Canadian online pharmacy advertisers to run these advertisements that geo-targeted the United States." Compare Complaint, Ex. 1 at 4 with Dkt. 16-1, Ex. A at 7. That acceptance of responsibility serves to distinguish this case from Scattered, in which the court found that the claims underlying the plaintiff's demand were "unsubstantiated." Moreover, the DRL's sweeping conclusion that "no wrongdoing or culpability occurred," when coupled with the NPA's express "acceptance of responsibility," does create reasonable doubt that the investigation was conducted reasonably and in good faith. To be clear, the court does not opine on the actual merits of the board's decision to refuse plaintiff's demand. It may be true that pursuing litigation was not in Google's best interests, and that demand was properly refused. However, the DRL merely recites the conclusion that refusal was proper without explaining how the committee reached that conclusion. Presumably, the committee report itself does contain a fuller level of detail. But in the absence of the court's or plaintiff's own review of the report itself, the court cannot find that the investigation was conducted reasonably and in good faith. Defendants essentially ask plaintiff and the court, via the DRL, to "take their word for it" regarding the thoroughness of the report.

   Plaintiff further distinguishes this case from Scattered by pointing out that the committee did not interview the DOJ's lead investigator, Peter Neronha, the Rhode Island U.S. Attorney. According to the complaint, Mr. Neronha led an investigation that spanned over four million documents, which allegedly show that defendant Page was aware of the Canadian pharmacy ad sales. Complaint, ¶ 46. In finding that demand was not wrongfully refused, the Scattered court noted that defendants had interviewed "people the plaintiffs had suggested would corroborate their claims of wrongful conduct." Defendants have not done so here. The court acknowledges that the committee was not obligated to interview every potential witness identified by plaintiff (or any witnesses at all), nor does it suggest that plaintiff is somehow relieved of its burden to show that the un-interviewed individuals "had knowledge that was unique and unobtainable without those interviews, and how those

13

interviews if taken would have altered the board's decision to refuse demand." Copeland v. Lane, 2012 WL 4845636 (N.D. Cal. Oct. 10, 2012). However, unlike in Copeland, plaintiff has identified witnesses who should have been interviewed but were not, and the court does find that any reasonable investigation of plaintiff's demand should have included an interview of Mr. Neronha, or someone with comparable knowledge of the DOJ's investigation.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiff has raised a reasonable doubt that the investigation of its demand was conducted reasonably and in good faith, and defendants' motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: September 26, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

14